**2024 IL 129753**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

(Docket No. 129753)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
KYJUANZI HARRIS, Appellant.

*Opinion filed November 21, 2024.*

JUSTICE HOLDER WHITE delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Neville, Overstreet, Cunningham, Rochford, and O'Brien concurred in the judgment and opinion.

**OPINION**

¶ 1 In 2012, a jury convicted petitioner Kyjuanzi Harris of two counts of first degree murder in the shooting deaths of Derrick Armstrong and Bernadette Turner. Subsequently, the Cook County circuit court sentenced petitioner to a mandatory term of life in prison. Petitioner's conviction and sentence were affirmed on direct appeal. In 2018, petitioner, through counsel, filed an initial petition pursuant to the

Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)), which the circuit court dismissed. Three years later, petitioner filed a motion for leave to file a successive postconviction petition under the Act alleging, in part, that he had newly discovered evidence of his actual innocence. Petitioner attached an affidavit from Wynton Collins, in which Collins averred he witnessed the shooting and identified a different person as the individual who shot and killed Armstrong and Turner. Collins stated he did not come forward and talk to the police earlier because he feared for his safety and that of his family. The circuit court denied the motion, finding the petition was without merit, as the affidavit did not explain how Collins came to light and whether trial counsel was aware of Collins at the time of trial.

¶ 2        The appellate court affirmed, finding petitioner's motion, successive petition, and affidavits did not establish Collins's testimony could not have been discovered earlier through the exercise of due diligence. 2022 IL App (1st) 211255-U, ¶ 33. The court also noted that petitioner failed to allege he only found out about Collins's testimony when he met him in prison and that Collins did not aver in his affidavit that he was in any way unavailable or could not have been located. *Id.* ¶ 38. The court acknowledged that Collins attested he did not come forward because he was afraid of the shooter, but the court concluded neither defendant nor Collins averred Collins would not have offered his testimony earlier had defendant tried to find him. *Id.* The court thus concluded that petitioner failed, as a matter of law, to make a colorable claim of actual innocence and that the circuit court did not err in denying him leave to file a successive petition on that basis. *Id.* ¶ 43.

¶ 3        On appeal before this court, petitioner argues that he presented a colorable claim of actual innocence because Collins's affidavit sufficiently established that he was an unknown witness and no amount of due diligence would have led to his discovery before trial because he did not wish to come forward. For the following reasons, we reverse and remand to the circuit court for further proceedings.

¶ 4                           I. BACKGROUND

¶ 5              A. Circuit Court Proceedings and Direct Appeal

¶ 6                        1. *Petitioner's Jury Trial*

¶ 7        On the evening of May 21, 2009, Derrick Armstrong and Bernadette Turner were shot to death as they sat in Turner's two-door Pontiac Grand Am near Horan Park in Chicago. Almost two years later, petitioner was arrested and charged with the murders. At trial, the State relied primarily on the testimony of two eyewitnesses—Tamira Smith and Debra Hardy.

¶ 8        Tamira Smith testified that she, Armstrong, and Turner were selling candy and snacks in the park the afternoon of May 21, 2009. At some point, Smith and Turner left the park and went to Smith's house, where Smith permed Turner's hair. They returned to the park at approximately 8:40 p.m. after Armstrong called Turner and asked her to pick him up. Armstrong, Turner, and Smith sat in the car with Armstrong in the driver's seat, Turner in the front passenger seat, and Smith in the back seat behind Turner. Turner and Armstrong rolled and smoked marijuana cigars, but Smith did not smoke, as she was pregnant.

¶ 9        Smith testified it was a warm evening and there were a few people outside. A little boy, about five or six years of age, approached the car on the driver's side, and as he did so, Smith saw a black car pull up on the passenger side of the car. Smith was about three feet from the driver of the black car and could see the driver's hair, complexion, and eyes. Smith was looking out of the "little back window" of Turner's Pontiac Grand Am when she saw the driver. She thought the driver was wearing a mask on the lower part of his face, but she was not sure. Smith testified it was around 9:15 p.m. but that the area was illuminated by street lighting. She acknowledged that, while the north side of the street had streetlights, the south side of the street, where Turner's car was parked, had no streetlights.

¶ 10       Smith saw the driver of the black car reach over with his left hand, stick a gun out of the window, and start firing at the passenger side window of Turner's car. When the shooting began, Smith ducked down, but she had looked at the driver for 5 to 10 seconds before he started shooting. The driver fired about eight consecutive shots before driving away. After the black car left, Smith pushed Armstrong out of

the car so she could get out and assist Armstrong and Turner, who had both been shot and were in "bad shape." It was "crazy" at the park, and people were screaming and running. Smith described it as a stressful and traumatic situation. She held Turner's hand as Turner passed away. An ambulance arrived and took Armstrong and Turner to the hospital. Smith went to the police station to talk to detectives.

¶ 11    In November 2010, Smith met with detectives again and identified petitioner in a photo array as being the person who shot Armstrong and Turner. In February 2011, Smith identified petitioner again in a physical lineup. Smith also made an in-court identification of petitioner as the driver of the black car. Smith testified she initially misidentified the model of the black car when she described it to the police, but she explained it was because she did not know car models. Smith acknowledged that defense counsel had attempted to talk to her about the case before trial and that she refused to talk to him or tell him where she lived.

¶ 12    Debra Hardy testified that, at the time of the trial, she was serving a 2½-year sentence in the Illinois Department of Corrections after being convicted of possession of a controlled substance. Hardy had an additional conviction for possession of a controlled substance and one for murder for which she had served a 20-year sentence. Hardy was using heroin daily around May 21, 2009. She had also undergone psychiatric treatment at various times in her life and been diagnosed with paranoid schizophrenia but was not taking medication to treat this condition at the time of the shooting.

¶ 13    Hardy testified she was in Horan Park the evening of May 21, 2009, at around 9:30 p.m. having a beer alone. Hardy estimated she arrived at the park at 5 p.m. and saw Armstrong and Turner sitting in Turner's car together, which was parked about 20 feet in front of Hardy. According to Hardy, they never left the park. There was another person in the back seat, but Hardy could not tell who the person was.

¶ 14    The area around the park was a heavy traffic area, and Hardy was not expecting a car to pull up. At some point, Hardy saw petitioner drive up to Turner's car. Hardy testified she recognized petitioner because they previously sold drugs together. After petitioner pulled up alongside Turner's car, he shot into Turner's car then drove away. Hardy testified that she started running when she saw Turner get out of the car and come toward her. Hardy was scared and was not able to do anything for Turner. Hardy testified she did not stay in the park after the shooting to talk to

the police; instead she followed the ambulance on foot to the hospital and spoke to Turner's mother. Hardy told Turner's mother that she knew who the shooter was but did not tell her the identity of the shooter. Hardy did not go to the police to report what she knew.

¶ 15　　Hardy testified the police located her on June 2, 2009, and she disclosed that petitioner was the shooter. However, Hardy also testified it was not until December 2010, when she was arrested on an unrelated charge, that she told the police "Okay, okay, now I will tell you who did it." The police then showed her a photo array, and she identified petitioner as the shooter. At trial, Hardy also made an in-court identification of petitioner as the shooter.

¶ 16　　The State presented evidence that there were no identifiable fingerprints found on 11 shell casings recovered from the scene of the shooting. The State presented further evidence that all the shell casings and bullets recovered in the case were fired from the same gun. However, no firearm was recovered. The assistant chief medical examiner who performed the autopsies on Armstrong and Turner testified that they died from multiple gunshot wounds.

¶ 17　　The jury found petitioner guilty of the first degree murders of Armstrong and Turner.

¶ 18　　　　　　　　　　2. *Petitioner's Posttrial Motion and Sentence*

¶ 19　　After the verdict, defense counsel made a motion to withdraw as counsel based on petitioner's claims to the Attorney Registration and Disciplinary Commission that counsel was ineffective in his handling of petitioner's case. The court noted that petitioner had not raised any of these issues before the court. Nevertheless, the court decided to conduct an inquiry pursuant to *People v. Krankel*, 102 Ill. 2d 181, 189 (1984). The court reviewed petitioner's issues regarding counsel's failure to call his alibi witnesses and counsel's advice to petitioner not to testify in his defense at trial. Ultimately, the court determined that counsel's choices were a matter of trial strategy and there was no need for further *Krankel* proceedings. However, the court granted defense counsel's motion to withdraw, and a public defender was appointed to represent petitioner in posttrial proceedings. Appointed counsel filed a posttrial motion, which was denied.

¶ 20 The court held a sentencing hearing at which both parties presented evidence. Petitioner also made a statement in allocution in which he maintained that he was innocent. Following petitioner's statement, the court sentenced him to a mandatory sentence of life imprisonment because petitioner was convicted of murdering more than one victim. 730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2008). Petitioner's conviction and sentence were affirmed on direct appeal. *People v. Harris*, 2016 IL App (1st) 141206-U.

¶ 21 B. Postconviction Proceedings

¶ 22 1. *Initial Postconviction Petition*

¶ 23 In August 2018, petitioner, through counsel, filed an initial postconviction petition under the Act. Petitioner alleged that trial counsel provided ineffective assistance by failing to (1) properly investigate his alibi witnesses, (2) stipulate to the testimony of investigating officers and the forensic witnesses at his trial, which would have limited the amount of testimony that went to procedural investigative matters and bolstered the State's case, and (3) put on a defense after the close of the State's case, thereby abandoning petitioner's defense. Petitioner further alleged that he had new evidence in the form of an affidavit from Donathan Williams, which proved that petitioner was innocent. In his signed statement, Williams stated that in 2013 he had a conversation with a man named Dennis Glover, whom he also referred to as "Sacky." Glover invited Williams to have a drink with him because it was Williams's birthday. The pair got drinks and some marijuana and drove around while they talked. During the conversation, Glover told Williams that he killed "ole boy and that bitch." Williams understood this to mean Glover shot Armstrong and Turner. Williams's signed statement was not notarized. Petitioner provided a signed statement from his investigator in which the investigator swore that Williams signed the statement in his presence.

¶ 24 Additionally, petitioner alleged Hardy provided a recorded statement to petitioner's investigator identifying her nephew, Dennis Glover, as the shooter and indicating she was coerced into testifying against petitioner. Petitioner did not attach an affidavit from Hardy but instead provided a signed statement from his investigator asserting the investigator memorialized the conversation with Hardy by audio recording and in a statement she signed.

- 6 -

¶ 25    The State filed a motion to dismiss the petition arguing that petitioner (1) failed to allege a cognizable constitutional claim under the Act, (2) failed to show prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984), and (3) failed to demonstrate actual innocence. The State argued petitioner's claims that counsel was ineffective were barred by *res judicata* and the law of the case because the appellate court found the circuit court conducted an adequate *Krankel* inquiry.

¶ 26    As to petitioner's claim of actual innocence, the State argued Williams's statement could not be considered because it was hearsay and petitioner failed to attach a notarized affidavit from Glover. Petitioner also failed to show that Williams could not have been discovered as a witness before petitioner was sentenced. The State argued that petitioner also failed to prove his allegation of actual innocence through Hardy because there was no affidavit from her.

¶ 27    Petitioner subsequently filed an amended postconviction petition. Petitioner attached a notarized affidavit from Hardy, acknowledging she made statements to petitioner's investigator, as well as the audio recording of their conversation.[1] The State filed a motion to dismiss the amended petition arguing, in part, that Hardy's affidavit was unreliable because she was recanting her trial testimony. Additionally, even without Hardy's testimony, Smith's identification of petitioner was sufficient for a conviction.

¶ 28    In February 2019, the circuit court granted the State's motion to dismiss the amended petition. Specifically addressing petitioner's actual innocence claims, the court found that Williams's statement was insufficient to support the claim, as it was hearsay and the statement was unnotarized. The court further found that Hardy's affidavit and her revised testimony were not new evidence because she was known to all parties before trial and testified at trial. However, even if Hardy's affidavit was to be accepted as new evidence, she provided no firsthand information as to the identity of the shooter, and her identification of Glover as the shooter was unsupported. The court also found Hardy's statements were not conclusive because

---

[1]The audio recording is not part of the record on appeal. In the appeal from the dismissal of petitioner's initial petition, the appellate court noted that the audio recording was consistent with the investigator's written summary. *People v. Harris*, 2020 IL App (1st) 190690-U, ¶ 48.

Smith consistently identified petitioner as the shooter. The court concluded that the issues petitioner raised were frivolous and patently without merit.

¶ 29    The appellate court affirmed the dismissal of the petition. *People v. Harris*, 2020 IL App (1st) 190690-U. In addressing petitioner's claims of actual innocence, the court found that Williams's statement could not be considered an affidavit for purposes of the Act, as it was not notarized. *Id.* ¶ 75. The court thus rejected the statement as supporting petitioner's claim of actual innocence. *Id.* ¶ 81. As to Hardy's affidavit, the court found that the affidavit was notarized and could be considered; however, it did not contain the substance of her statements to petitioner's investigator. *Id.* ¶ 79. The statements identifying Glover as the shooter were not notarized, and Hardy failed to make the same statements in her notarized affidavits. *Id.* The court thus affirmed the dismissal of petitioner's amended postconviction petition because he failed to make a substantial showing of his innocence. *Id.* ¶ 81.

¶ 30                      2. *Motion for Leave to File a Successive*
                            *Postconviction Petition*

¶ 31    In August 2021, petitioner filed a motion for leave to file a successive postconviction petition. Petitioner explained that he should be granted leave to file a successive petition because (1) he was raising a claim of actual innocence and (2) he was raising a constitutional claim of error in his sentencing that could not be raised in earlier proceedings. [2] In support of his claim of actual innocence, petitioner attached a signed and notarized affidavit from Wynton Collins. Petitioner asked the circuit court to liberally read his petition because he was an untrained *pro se* litigant. Within the body of the motion, petitioner summarized the statements from Collins's affidavit and characterized Collins's affidavit as exonerating him.

¶ 32    In his affidavit, Collins explained he was incarcerated in the same prison as petitioner when they met and began working out together. As they talked about their backgrounds, petitioner and Collins discovered they grew up a few blocks

---

[2]On appeal before this court, petitioner does not contest the appellate court's finding as to his sentencing claim. We therefore limit the recitation of the facts pertaining to the motion for leave to file a successive petition to those regarding the actual innocence claim.

- 8 -

from each other and that drew them closer. One day, petitioner and Collins discussed their cases, and Collins disclosed he had firsthand knowledge of the circumstances of the murders that took place on May 21, 2009, near Horan Park.

¶ 33 Collins averred that around 9 p.m. on May 21, 2009, he was parked on Van Buren Street and Whipple Street. He was sitting on the hood of his car and talking to a woman named Tasha when he saw "the homie Sacky" drive by in a black car. Collins tried to speak to Sacky, but Sacky pulled up to a car parked directly in front of Collins and fired 10 to 15 gunshots at the two occupants of the car. Collins took off running to the north side of Van Buren Street and west toward Albany Avenue and hid behind a car. Tasha ran in a different direction, and Collins never saw her again. Collins hid until he saw Sacky drive away. Collins ran back to his car and saw that the two occupants of the car parked in front of his car appeared to be dead. Collins heard screeching tires and thought Sacky was returning to shoot him. Scared, Collins got in his car and drove away.

¶ 34 Collins explained that the reason he did not go to the police to report what he witnessed was because he feared for his safety and that of his family because "everybody know how Sacky get down." Collins did not wish to put his family in harm's way, but after he discovered someone else was incarcerated for Sacky's actions, he decided he had to come forward. He stated he was never interviewed by the police, any attorney, an investigator, or anyone else regarding this case. Collins added that he was not threatened or promised anything in exchange for his testimony. Collins swore the contents of his affidavit were true and, if he was called to testify, he would "do so completely."

¶ 35 The circuit court denied the motion for leave to file a successive petition. Referring to Collins's affidavit, the court stated,

"The guy he has an actual innocence claim, he has [an] affidavit from someone. I have no idea who this person is and where they came from, what his lawyer knew or didn't know, how this came to light and why this person is so late in coming to their claims in their affidavit. Only that somehow they found out many, many years later about this horrific crime and that somebody else, not Sackey [*sic*], was the person who was convicted. This case happen [*sic*] ten years ago in 2011.

- 9 -

> Without contacts [*sic*] as to where this second petition came from and what the lawyer at trial knew or didn't know about this witness and how they came to come forward now, it's all very unclear. I find this successive *pro se* post-conviction is without merit. It will be denied."

Petitioner filed a timely notice of appeal.

¶ 36    The appellate court affirmed the denial of petitioner's motion. 2022 IL App (1st) 211255-U. The court concluded that petitioner's claim of actual innocence failed because he did not show Collins's affidavit was new. *Id.* ¶ 30. The court recognized that to be new, evidence must have been discovered after trial and could not have been discovered earlier through the exercise of due diligence. *Id.* ¶ 31 (citing *People v. Coleman*, 2013 IL 113307, ¶ 96). The court found that from its review of the record, given Collins's position on the hood of his car behind Turner's car, he would have been visible to Hardy and Smith before the shooting. *Id.* ¶ 35. The court also found Collins would have been observed by Smith and Hardy when he returned to his car after the shooting. *Id.* ¶ 36.

¶ 37    The court further found that there was no evidence in the record that petitioner attempted to ascertain who was at the scene besides Smith and Hardy and that petitioner failed to explain why Collins could not be identified or located sooner. *Id.* ¶ 37. The court thus found that petitioner failed to allege he made a diligent effort to locate or identify Collins sooner. *Id.* The court suggested petitioner could have alleged that Smith and Hardy failed to tell the police that someone sat on the vehicle parked directly behind the Grand Am when the shooting began or that someone returned to the car. *Id.* ¶ 38. The court also found that petitioner failed to allege he only found out about Collins's evidence when he met him in prison and that Collins did not aver he was unavailable and could not be located. *Id.* The court acknowledged Collins stated he did not come forward because he was afraid of Sacky, but the court found petitioner and Collins failed to allege Collins would not have offered his affidavit earlier had defendant tried to find him. *Id.* The court concluded that petitioner failed, as a matter of law, to make a colorable claim of actual innocence and that the circuit court did not err in denying him leave to file a successive petition on that basis. *Id.* ¶ 43.

¶ 38    This court granted petitioner's petition for leave to appeal. Ill. S. Ct. R. 315(a) (eff. Oct. 1, 2021).

¶ 39                                    II. ANALYSIS

¶ 40    In this appeal, petitioner argues that he made a colorable claim of actual innocence by providing Collins's affidavit, which established that someone other than petitioner shot Armstrong and Turner, petitioner did not meet Collins until they were incarcerated together, and Collins did not come forward sooner because he was afraid of the actual shooter. Petitioner argues Collins could not have been discovered as a witness before trial because he was an "unknown, unobserved, and unrecorded" witness who was unavailable due to his fear of Sacky. The State responds that petitioner failed to allege that Collins, given his location in relation to Turner's car, could not have been discovered before trial or, at the latest, before petitioner filed his initial postconviction petition.

¶ 41                      A. Successive Postconviction Petitions

¶ 42    The Act permits an imprisoned person to institute a proceeding asserting there was a substantial denial of his rights under the Constitutions of the United States or of the State of Illinois or both. 725 ILCS 5/122-1(a)(1) (West 2018). Any claim of a substantial denial of constitutional rights not raised in an original or amended petition is waived. *Id.* § 122-3. Only one postconviction proceeding is contemplated under the Act. *Id.* § 122-1(f). However, we have previously recognized that fundamental fairness requires relaxation of the statutory bar to a successive petition in some cases. *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002). As a result, this court has identified two exceptions that allow a petitioner to file a successive postconviction petition with leave of the circuit court. *Id.*; *People v. Edwards*, 2012 IL 111711, ¶ 22. First, for a petitioner to be granted leave to file a successive petition, the petitioner must establish cause and prejudice for not raising the claim in an initial postconviction petition. 725 ILCS 5/122-1(f) (West 2018); *Pitsonbarger*, 205 Ill. 2d at 459. Second, a petitioner may be granted leave to file a successive petition to avert a " 'fundamental miscarriage of justice.' " *Edwards*, 2012 IL 111711, ¶ 23. "In order to demonstrate a miscarriage of justice to excuse the application of the procedural bar, a petitioner must show actual innocence." *Id.*

The exception for claims of actual innocence is not codified by the legislature; however, this court has reaffirmed its use in relaxing the bar against successive postconviction proceedings. *Id.*

¶ 43 For petitioners seeking to file a successive petition based on a claim of actual innocence, "leave of court should be denied only where it is clear, from a review of the successive petition and the documentation provided by the petitioner that, as a matter of law, the petitioner cannot set forth a colorable claim of actual innocence." *Id.* ¶ 24. When a petitioner, through his supporting documentation, raises the probability that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence, the court should grant leave to file. *Id.* Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence. *People v. Robinson*, 2020 IL 123849, ¶ 48.

¶ 44 We review *de novo* the denial of leave to file a successive postconviction petition alleging actual innocence. *Id.* ¶ 40.

¶ 45 B. A Claim of Actual Innocence

¶ 46 1. *Sufficient Pleading*

¶ 47 When a petitioner submits evidence to support an actual innocence claim, the evidence must be new, material, noncumulative, and, most importantly, of such conclusive character as would probably change the verdict on retrial. *People v. Washington*, 171 Ill. 2d 475, 489 (1996). The State first argues petitioner failed to allege Collins's proposed testimony was newly discovered. Thus, the initial question is whether petitioner sufficiently alleged, in his motion and with his supporting documents, that Collins's affidavit was new evidence establishing a colorable claim of petitioner's innocence.

¶ 48 The petitioner bears the burden to obtain leave of court before a successive postconviction petition may be filed so that further proceedings on his claims can follow. *Edwards*, 2012 IL 111711, ¶ 24. To do so, it is incumbent upon the petitioner, by whatever means, to prompt the circuit court to consider whether leave should be granted. *Id.*; *People v. Tidwell*, 236 Ill. 2d 150, 157 (2010). In doing so,

the petitioner must submit enough in the way of documentation to allow a circuit court to decide whether leave to file a successive petition should be granted. *Edwards*, 2012 IL 111711, ¶ 24.

¶ 49    Here, petitioner's motion specifically identified Collins's affidavit as "newly discovered evidence" of petitioner's innocence. Petitioner did not list the legal elements of an actual innocence claim, but he identified his claim as one of actual innocence and attached what he alleged was new evidence in support of that claim. In his affidavit, Collins stated that he witnessed the shooting on May 21, 2009, and identified the shooter as Sacky. Collins explained that, fearing for his safety and that of his family, he left the scene soon after the shooting and chose not to speak to anyone about what he saw. As such, Collins was never interviewed by the police, any attorney, an investigator, or anyone else regarding this case. Collins further averred that he and petitioner met in prison, which was after petitioner's trial, where they first discussed the case. We find these allegations were sufficient to prompt the circuit court to analyze whether petitioner made a colorable showing of actual innocence and consider whether leave should be granted to file a successive postconviction petition.

¶ 50    We now consider whether Collins's affidavit was "new," as required to establish a colorable claim of actual innocence. See *Washington*, 171 Ill. 2d at 489.

¶ 51                            2. *"New" Evidence*

¶ 52    This court's precedent establishes that "new" for purposes of an actual innocence claim means evidence that was discovered after trial and that could not have been discovered earlier through the exercise of due diligence. *Coleman*, 2013 IL 113307, ¶ 96. Petitioner, through Collins's affidavit, alleged Collins was an eyewitness who fled the scene after the shooting and was not interviewed by the police, investigators, attorneys, or anyone else. Petitioner also alleged that he first met Collins in prison after trial and talked to him about his case. Petitioner therefore alleged that Collins's affidavit was newly discovered evidence of his innocence.

¶ 53    The appellate court found that Collins could have been discovered at the time of the trial because, from his position behind the victim's car, he would have been

- 13 -

visible to both Smith and Hardy before and after the shooting. 2022 IL App (1st) 211255-U, ¶¶ 34-36. The court went on to find

> "there is no evidence in the record that defendant ever attempted to ascertain who was at the scene besides Smith and Hardy and defendant offers no explanation in his motion for leave to file, successive petition incorporated therein, or affidavit, regarding why Collins could not be identified or located sooner." *Id.* ¶ 37.

The court also faulted petitioner for not alleging that Smith and Hardy failed to tell police about Collins. *Id.* ¶ 38. The State asks that we affirm the appellate court's findings. We find the appellate court's analysis was speculative and made factual determinations about what Smith and Hardy were able to observe and placed a greater burden on petitioner than is required at the leave-to-file stage. As we have repeatedly affirmed, factual and credibility determinations should not be made at the leave-to-file stage. *People v. Flournoy*, 2024 IL 129353, ¶ 77.

¶ 54    Additionally, the record does not support the appellate court's findings. The appellate court's analysis does not explain why Smith, before the shooting, would have been scanning her surroundings for a witness when she testified she was neither expecting a car to pull up nor looking behind her, in Collins's direction. In her testimony, Smith did not even acknowledge seeing Hardy, who was only 20 feet from Turner's car at the time of the shooting. Indeed, after Hardy left the scene on the night of the shooting, it took the police some time to find her despite her close proximity to Smith. After the shooting, Smith described a chaotic scene with people screaming and running. Smith was also focused on her dying friend. Smith's testimony cannot support the appellate court's finding that Smith would have seen Collins after the shooting as he returned to his car. Additionally, Smith refused to talk to the defense about the case, implying that, even if she had seen Collins, she would not have told the defense about him.

¶ 55    Hardy, in turn, testified there were many people at the park and Turner's car was parked near a busy thoroughfare. There is no indication in the record that Hardy was able to identify any of the other people in the park on the night of the shooting. Like Smith, Hardy also fled after the shooting, and when she tried to return to the scene, she was looking at Turner, who she testified was asking her for help. Notably, Collins explained that he fled the scene immediately after the shooting

- 14 -

and chose not to speak to anyone about what he had seen because he was afraid of Sacky. The record does not contradict this assertion. Under these circumstances, Collins was an unknown, unobserved, and unrecorded witness, and no amount of due diligence would have forced him to come forward before trial.[3]

¶ 56    Petitioner relies on *People v. Anderson*, 2021 IL App (1st) 200040. The petitioner in *Anderson* was convicted of first degree murder. *Id.* ¶ 19. The petitioner filed an unsuccessful initial postconviction petition that was dismissed at the first stage. *Id.* ¶ 20. The petitioner later sought leave to file a successive postconviction petition and attached three affidavits to his petition, one from himself declaring his innocence and two from two people who averred they were eyewitnesses and identified another person as having committed the murder. *Id.* ¶¶ 22-24. Both witnesses explained they did not come forward sooner because they did not want to get involved. *Id.* ¶¶ 23-24. One of the witnesses further explained that he did not come forward sooner because he was dating the same girl as the petitioner and they did not like each other. *Id.* ¶ 24. The petitioner's motion for leave to file asserted that both " 'newly discovered affidavits' " supported his claim of actual innocence. *Id.* ¶ 25. The circuit court denied the motion for leave to file the successive postconviction petition. *Id.* ¶ 27. On appeal, the appellate court found that, "[i]f an unknown, unobserved, and unrecorded witness chooses not to come forward, there is no amount of due diligence that can force him or her to come forward to 'get involved.' " *Id.* ¶ 63. The court thus found the petitioner satisfied the standard for alleging an actual innocence claim based on newly discovered evidence at the leave-to-file stage. *Id.* ¶ 65. We find this reasoning sound and persuasive, as it is consistent with our holding in *People v. Ortiz*, 235 Ill. 2d 319, 334 (2009), where we found a witness was newly discovered because he did not come forward until more than 10 years after trial and essentially made himself unavailable as a witness when he moved to Wisconsin shortly after the murder.

¶ 57    In *Anderson*, the State argued that the eyewitnesses presented by the petitioner were not newly discovered because the petitioner, who was present at the scene,

---

[3]This case is distinguishable from a case where the petitioner should know about a witness, for example when the witness is an alibi witness who had no legal limitation, such as a fifth amendment right to avoid self-incrimination (U.S. Const., amend. V), to testifying at trial. See, *e.g.*, *Edwards*, 2012 IL 111711, ¶¶ 34, 38 (affirming that it was illogical for a defendant to claim that evidence of his alibi was new evidence).

must have known who else was present. *Anderson*, 2021 IL App (1st) 200040, ¶ 61. The court rejected this argument because it found the State failed to explain why the petitioner would have been scanning the other side of a major thoroughfare looking for a witness or how he could have observed both witnesses when they averred that they fled the scene immediately following the shooting. *Id.* ¶ 62.

¶ 58    The appellate court in this case distinguished *Anderson* based on the court's finding that Smith and Hardy would have observed Collins, whereas in *Anderson*, the court found it was unlikely the petitioner or others saw the affiants at the scene of the crime from the opposite side of a major thoroughfare. We find this distinction unpersuasive. Factual determinations are precluded at the leave-to-file stage. See *Flournoy*, 2024 IL 129353, ¶ 77; *Robinson*, 2020 IL 123849, ¶ 45. A court cannot speculate as to what a witness saw or did not see, unless such facts are indisputable from the record. See *Robinson*, 2020 IL 123849, ¶ 45 ("At the pleading stage of postconviction proceedings, all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true."). Therefore, just as the *Anderson* court declined to speculate as to whether the petitioner would have observed the witnesses, we cannot speculate as to what Smith and Hardy witnessed beyond what they testified to in court.

¶ 59                      3. *Due Diligence and Initial Postconviction Petitions*

¶ 60    The State also argues that, in considering petitioner's diligence in discovering Collins as a witness, we should consider whether Collins could have been discovered before petitioner filed his initial postconviction petition. Essentially, although the State couches this requirement as a due diligence requirement, the State would require the petitioner to show cause for failing to raise his actual innocence claim in his initial petition. Consistent with our position in *Ortiz*, 235 Ill. 2d 319, we decline to adopt this approach. In *Ortiz*, the petitioner's third successive postconviction petition was denied following an evidentiary hearing. *Id.* at 327. On appeal, the State argued that the trial court should not have allowed the petitioner to file the third successive postconviction petition because the petitioner failed to satisfy the cause and prejudice test. *Id.* at 330. As part of that argument, the State contended that, "even if a petitioner's first successive postconviction petition based on actual innocence need not comply with the cause-and-prejudice test, subsequent

- 16 -

petitions are subject to the test because they present the same 'claim.' " *Id.* at 332. The State further argued that this approach would limit piecemeal postconviction petitions. *Id.*

¶ 61    This court first rejected the State's argument that the cause and prejudice test be applied to a claim of actual innocence, because applying the test could theoretically bar a petitioner from filing a freestanding actual innocence claim. *Id.* We found we could not allow this "as a matter of substantive and procedural due process under the Illinois Constitution." *Id.* We further held that the State's concern regarding piecemeal litigation was unwarranted because " '[t]he preclusion doctrines of *res judicata*, collateral estoppel, and law of the case prevent a defendant from "taking two bites out of the same appellate apple" ' and avoid 'piecemeal post-conviction litigation.' " *Id.* (quoting *People v. Tenner*, 206 Ill. 2d 381, 395, 398 (2002), quoting *People v. Partee*, 125 Ill. 2d 24, 37 (1988)). We went on to find that the petitioner's third successive petition did not raise the same claim as his other petitions raising actual innocence because he presented two additional eyewitnesses who were previously unknown to defendant, who had been discovered since trial, and who could not have been discovered sooner through due diligence. *Id.* at 333-34. Therefore, even though petitioner had filed two prior postconviction petitions, this court adhered to its precedent and only considered whether the newly discovered evidence the petitioner presented in support of his actual innocence could have been discovered before trial. *Id.* at 334. We continue to adhere to our precedent and decline to adopt a quasi-cause requirement for a petitioner seeking to raise an actual innocence claim in a successive petition, as we find it antithetical to a petitioner's due process rights to assert a freestanding claim of actual innocence based on newly discovered evidence. See *id.* at 331-32.

¶ 62                    4. *Material, Noncumulative, and Conclusive*

¶ 63    Having concluded that petitioner sufficiently established that Collins's affidavit was new evidence, we next consider whether Collins's affidavit was also material, noncumulative, and conclusive. See *Edwards*, 2012 IL 111711, ¶ 32 ("The elements of a claim of actual innocence are that the evidence in support of the claim must be 'newly discovered'; material and not merely cumulative; and of such conclusive character that it would probably change the result on retrial."). In the

appellate court, the State did not dispute that Collins's affidavit was material and noncumulative. 2022 IL App (1st) 211255-U, ¶ 30. Before this court, the State did not respond to petitioner's argument that Collins's affidavit meets the material, noncumulative, and conclusive elements. The State thus forfeited any arguments to the contrary. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."); *People v. Artis*, 232 Ill. 2d 156, 178 (2009) (noting that the rules of forfeiture are applicable to the State as well as to the defendant). Instead, the State asks, in a footnote in its brief, that, should we find that the evidence of Collins's affidavit was newly discovered, we remand for the appellate court to address the unadjudicated question of whether the evidence was conclusive.

¶ 64    Our review of the denial of leave to file a successive postconviction petition is *de novo*, which means that we perform the same analysis that a circuit court judge would perform, and in the interest of judicial economy, we choose to consider whether Collins's affidavit was conclusive. *Robinson*, 2020 IL 123849, ¶ 40 (holding the denial of leave to file a successive postconviction petition alleging actual innocence is reviewed *de novo*).

¶ 65    The conclusive character of the new evidence is the most important element of an actual innocence claim. *Id.* ¶ 47 (citing *Washington*, 171 Ill. 2d at 489). "Conclusive" means the evidence, when considered along with the trial evidence, would probably lead to a different result. *Coleman*, 2013 IL 113307, ¶ 96. The conclusive-character element requires only that the petitioner present evidence that places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. *Robinson*, 2020 IL 123849, ¶ 56. Probability, not certainty, is the key, as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together. *Coleman*, 2013 IL 113307, ¶ 97.

¶ 66    Taking the statements in Collins's affidavit as true, we find that there is a probability that a jury would reach a different result. In petitioner's trial, there was no forensic evidence linking petitioner to the crime, and the State's case rested on the testimony of two witnesses who identified petitioner as the shooter. The first witness, Smith, testified she was about three feet from the shooter when she first saw him and that she was able to see his hair, complexion, and eyes. According to

- 18 -

Smith, the shooter may also have been wearing a mask on the lower part of his face, and she saw the driver for 5 to 10 seconds before he started shooting, at which point she ducked down. Smith also testified that, when she saw the shooter, she was looking out of the "little back window" of Turner's Pontiac Grand Am.

¶ 67 The second witness, Hardy, testified she was using heroin daily around the time of the shooting and had a beer sometime before the shooting. She had also been diagnosed with paranoid schizophrenia but was not taking any medication to treat this condition at the time of the shooting. Hardy testified she recognized petitioner as the shooter because they used to sell drugs together.

¶ 68 Collins's affidavit is consistent with the trial record as to the location and time of the shooting. Collins alleges that he saw Sacky's car drive up and he recognized Sacky. He tried to talk to Sacky, but Sacky drove by and pulled up to the victims' car. Collins then saw Sacky shoot the victims.

¶ 69 Collins's account of the shooting provides an additional eyewitness to the shooting who was familiar with the person he identified as the shooter and who was in a position to observe him clearly before the shooting. Collins's affidavit is also not positively rebutted by any evidence in the record. *Robinson*, 2020 IL 123849, ¶ 60 (explaining that, for new evidence to be positively rebutted, it must be clear from the trial record that no fact finder could ever accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible). While we cannot weigh the credibility of the trial witnesses against Collins's account at the leave-to-file stage, with no forensic evidence connecting petitioner to the crime, we find a jury could determine that Collins's proposed testimony exculpates petitioner as the shooter and refutes the testimonies of Hardy and Smith. Collins's proposed testimony thus raises the probability that it is more likely than not that no reasonable juror would have convicted the petitioner in light of his testimony. See *id.* ¶ 44.

¶ 70 We note that there is record evidence of statements from Hardy recanting her trial testimony and identifying her nephew, Sacky, as the shooter. Petitioner argues that this evidence should be considered in determining the conclusive nature of Collins's new evidence. We decline to do so because Hardy's recantation cannot be considered at this stage of the proceedings, as it was rejected during the proceedings on petitioner's initial postconviction petition and no affidavit from

Hardy was attached to petitioner's motion for leave to file a successive postconviction petition.

¶ 71        In remanding this case for second-stage proceedings, we express no opinion on the merit of petitioner's claim of actual innocence or even whether an evidentiary hearing on his claim would be appropriate. On remand, the circuit court will have an opportunity to evaluate the claim once petitioner's counsel has made any amendments to the petition that are necessary for an adequate presentation of petitioner's claim of actual innocence. See *People v. Turner*, 187 Ill. 2d 406, 417 (1999).

¶ 72                                III. CONCLUSION

¶ 73        Having found that petitioner presented newly discovered evidence that could not have been discovered before trial and that such evidence makes a colorable showing of actual innocence, we find the circuit court should have granted petitioner leave to file a successive postconviction petition. Accordingly, we reverse the judgments of the appellate and circuit courts and remand the cause to the circuit court for second-stage postconviction proceedings.

¶ 74        Judgments reversed.

¶ 75        Cause remanded.