NOTICE

Decision filed 07/31/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 220176-U

NO. 5-22-0176

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 15-CF-881 |
| | ) | |
| DIEGO R. CHRISTMON, | ) | Honorable |
| | ) | Randall B. Rosenbaum, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Cates and Boie* concurred in the judgment.

**ORDER**

¶ 1   *Held*: The circuit court did not err in denying defendant leave to file a successive postconviction petition where defendant failed to present a colorable claim of actual innocence.

¶ 2   Defendant, Diego R. Christmon, appeals the circuit court's order denying his motion for leave to file a successive postconviction petition. For the following reasons, we affirm.

¶ 3                     I. BACKGROUND

¶ 4   Defendant was convicted of attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2014)) in that defendant personally discharged a firearm that caused great bodily harm to Lawrence Brown. The following evidence was presented at the trial.

---

*Justice Welch participated in oral argument. Justice Boie was later substituted on the panel and has read the briefs and listened to the recording of oral argument.

1

¶ 5    Lawrence, also known as "Hot Folk," testified that he was at 1310 Hedge Road, Champaign, Illinois, smoking and drinking with several other people. Defendant walked over from his great-grandmother's house next door. Lawrence had known defendant for more than two years and there was no animosity between them. Lawrence stated he was not upset with defendant that day. He joked with defendant, and defendant appeared upset. Lawrence testified that a song was playing when he was joking and he sang the lyrics, which were "If you don't like me shut up or kill me." Eventually, defendant left. When defendant returned about 15 to 20 minutes later, defendant walked around the side of his great-grandmother's house and Lawrence followed. Lawrence stated that he did not have a gun or a knife and held nothing in his hand. As he walked around the corner, defendant held up a gun and threatened Lawrence. Lawrence continued to walk toward defendant, and defendant shot at him. He stated the first shot struck him in the back. Lawrence turned and attempted to walk back to the front of the house when he felt two more shots hit his leg. Lawrence lost consciousness, and defendant shot him in the head. Lawrence was shot a total of four times and incurred long-term injuries. On cross-examination, Lawrence testified that he followed defendant to the side of defendant's great-grandmother's house because two individuals at the gathering told Lawrence that defendant had a gun and Lawrence did not believe them.

¶ 6    Shawnda Dean testified that she was present at the Hedge Road gathering on May 23, 2015. She stated everyone, including Lawrence and defendant, were joking around. She heard Lawrence sing a song that said something like "shut and kill me" and defendant replied by asking who would tell on him if he did. She further testified that at some point, defendant left for about 20 to 30 minutes. When defendant returned, he called Lawrence to walk around to the back of the house. Dean watched Lawrence walk across the front of the house and try to pick up a stake, but the string

2

was stuck on something, so Lawrence threw it down. When Lawrence walked around the corner of the house, Dean heard multiple "tinging" sounds. When she looked up, Lawrence was walking toward her, and blood was running down his pants. Defendant appeared from around the corner of the house, shot Lawrence in the head, and Lawrence fell to the ground. Defendant then got into his truck and left.

¶ 7    Tanisha Baity testified similarly to Dean. Lakeeshin Picket also testified similarly to Baity and Dean, except she did not mention that defendant shot Lawrence after Lawrence was at the front of the house and fell.

¶ 8    Wesley Christmon, defendant's great-uncle, was at 1308 Hedge Road on May 23, 2015, and overheard a conversation between defendant and another person. Wesley stated the tone of the other person was agitated and defendant was not agitated. Eventually, defendant left, returned, and went to the side of the house. Wesley saw a man run across the yard to go to the side of house while unsuccessfully attempting to pull a stake from the front yard. Once the man was around the house, Wesley heard gunshots. The man walked out from around the house and fell to the ground. He did not hear another gunshot after the man became visible. Defendant then got into his truck and left. Wesley denied seeing defendant shoot Lawrence as he was on the ground and denied seeing defendant with a gun. Wesley did not remember telling the detectives that defendant shot Lawrence in the shoulder or head while he was on the ground. He also did not remember describing the gun defendant had to the detectives. Wesley admitted he was inebriated at the time of the shooting.

¶ 9    Anna Pierce, defendant's great-grandmother, testified that on May 23, 2015, defendant came to her house at 1308 Hedge Road with his infant daughter. While she was sitting on her front porch visiting with a friend and her son, she heard Lawrence joking with defendant. At some point,

defendant left, and she called defendant to bring his baby's diaper bag back. When defendant got back, he walked around to the side of her house. Pierce testified that Lawrence then walked across her front yard and attempted to pull a stake out of the yard but was unsuccessful and threw the stake down. Just as Lawrence got around the corner of the house, she heard shots. She saw Lawrence stagger back around the corner and fall to his side. She then saw defendant come from the side of the house and shoot Lawrence as he lay on his back. Defendant then left.

¶ 10 Doctor Sherfield Dawson III testified that he performed surgery on Lawrence on May 23, 2015. Lawrence had a compromised airway from a bullet that entered through the posterior of the head and exited through the mouth, a through-and-through gunshot wound from the upper right back through the right chest, and two gunshot wounds to his extremities. Three doctors performed a three-hour surgery that day and Lawrence underwent a subsequent surgery about a week later to drain additional blood from his chest. Dr. Sherfield testified that if Lawrence had not received the surgeries, he would have died.

¶ 11 Officers discovered three 9-millimeter gun casings in the vicinity of 1308 Hedge Road and one fired bullet. Officers did not locate a gun on the property or in the vehicle defendant drove. When officers located and arrested defendant on June 17, 2015, he was not in possession of a gun.

¶ 12 Smooth Rivers testified that he was present at 1308 Hedge Road on May 23, 2015, and defendant arrived at 3 or 4 p.m. He and defendant left to grab defendant's daughter's diaper bag and when they returned there were "a bunch" of people outside. Rivers stated "a confrontation broke out" involving Lawrence and defendant. Then, he and defendant walked to the back of defendant's great-grandmother's house to smoke, and Rivers attempted to calm defendant down. They were by the shed for about five minutes when Rivers heard footsteps. He saw Lawrence approaching the shed with a shiny, foreign object in his right hand with his arm extended. Rivers

4

went into the shed, shut the door, and smoked. He heard two gunshots and when he left the shed, Lawrence was on the ground, and defendant was gone.

¶ 13    Defendant testified that when the joking occurred at the Hedge Road gathering, Lawrence made jokes and threats to defendant. Lawrence joked that defendant was his son. Defendant's great-grandmother interrupted because his infant daughter needed changed. Defendant realized he did not bring the diaper bag, so he and Rivers went to his apartment to grab the diaper bag. When they returned and gave his great-grandmother the diaper bag, he and Rivers went to the backyard to smoke. After about 10 minutes, defendant heard something drop and looked up to see Lawrence reaching down to grab something about four or five feet in front of defendant. Defendant ran and pushed Lawrence while grabbing a gun from the ground. When Lawrence turned around like he was going to continue toward defendant, defendant "stepped back and shot." He testified that he was scared and thought he was saving his life because he knew he could not put up a fight if Lawrence got the gun back. Defendant stated after he shot Lawrence, he dropped the gun. As he knelt down to call 911, someone ran across the yard toward him, so he got into his truck and left. Defendant did not remember how many times he shot the gun.

¶ 14    At the conclusion of the trial, a jury found the defendant guilty. On May 2, 2016, the court sentenced defendant to 40 years' imprisonment. On direct appeal, on August 28, 2018, defendant asserted that his sentence was excessive; however, the Fourth District Appellate Court affirmed defendant's sentence. *People v. Christmon*, 2018 IL App (4th) 160424-U, ¶ 3.

¶ 15    On January 4, 2019, defendant filed a *pro se* postconviction petition, asserting claims of ineffective assistance of trial and appellate counsel. The circuit court dismissed the *pro se* petition as frivolous and patently meritless. The Fourth District Appellate Court affirmed. *People v. Christmon*, 2021 IL App (4th) 190135-U, ¶ 28.

¶ 16    On January 2, 2020, defendant filed a section 2-1401 motion to vacate a void judgment, challenging his sentence. The circuit court dismissed the petition, and the appellate court affirmed the dismissal. *People v. Christmon*, 2021 IL App (4th) 200184-U, ¶ 2.

¶ 17    On December 16, 2021, defendant filed a motion for leave to file a successive postconviction petition, claiming actual innocence. Defendant asserted he presented affidavits from Smooth Rivers, Dayanna Christmon, and Jason Eatmon, all of which were newly discovered, material, and not cumulative. Defendant also presented forensic evidence that the police found a 9-millimeter bullet from a Ford Fusion involved in an incident where Lawrence Brown's cousin, Shawntell Brown, shot the driver. He argued that the 9-millimeter bullet was the same caliber defendant shot while defending his own life. He also presented evidence of an incident where his house was shot in retaliation. Defendant argued, citing *People v. Woods*, 2020 IL App (1st) 163031, that this evidence supported his claim of self-defense which could serve as an actual innocence claim. He stated the affidavits, forensic evidence, and police reports were not available at trial or at the time he filed his initial postconviction petition.

¶ 18    In the successive postconviction petition, defendant attached the same evidence referenced in his motion for leave to file a successive petition. Defendant contended that the aforementioned evidence showed that Lawrence was the aggressor, retrieved the gun from a gray vehicle before confronting defendant, and another individual placed the gun back into the car after the shooting. He argued the evidence was new, material, and would have changed the outcome of trial.

¶ 19    Smooth Rivers's affidavit stated that he previously lied when he testified at defendant's trial because he did not enter the shed and actually observed the events. He stated after the verbal exchange between defendant and Lawrence, he and defendant went around the side of the house toward the garage to smoke weed. While he was standing with defendant, Lawrence walked toward

6

them with a gun raised pointed at defendant. Lawrence tripped and dropped the gun, and Rivers told defendant, "he trying to kill you bro." Defendant rushed and picked up the gun, and Lawrence got onto his feet and continued walking toward defendant while stating, "You want to talk s*** you ain't going do s***." Defendant looked scared, shot Lawrence, dropped the gun, and left. Rivers stated he did not want to tell the truth at defendant's trial because he was afraid of getting into trouble and was threatened by Lawrence and his acquaintances. He further averred that after Lawrence was shot, defendant's house was shot in retaliation which only increased his fear. He was now coming forward because he could not let his friend spend his whole life in prison.

¶ 20    Dayanna Christmon's affidavit attested that she was visiting her great-grandmother on May 23, 2015, at 1308 Hedge Road. Shortly after she stepped off her great-grandmother's porch and went to talk to her friend, a gray car driven by Lawrence backed into the driveway of 1310 Hedge Road. Defendant then pulled into his great-grandmother's driveway, went into the yard of 1310 Hedge Road, and started talking to Lawrence. Dayanna did not hear their entire conversation but heard her brother say to Lawrence, "stop playing with me" and Lawrence said, "what the f*** you gone do." Lawrence then told defendant to get his money and also said "you don't like me shut up and kill me." Dayanna averred that defendant came back to his great-grandmother's yard to talk with his family and then left with his friend Rivers. About 10 or 15 minutes later, defendant returned and went into his great-grandmother's house. Defendant and his friend later left the house and went around to the backyard. As Dayanna stood with a group of people in the driveway of 1310 Hedge Road, a man named "L" walked up to Lawrence and said something to him. Lawrence walked to the gray car, opened the passenger door, knelt inside the car, and grabbed something out of the car. Lawrence then walked across her great-grandmother's yard and tried to pull a stick out of the ground but was unable to untie the rope, so he dropped it and continued to walk toward her

7

great-grandmother's backyard. Moments later, Dayanna heard sounds like fireworks and when the sounds stopped, Lawrence stumbled to the front and fell to the ground. After Dayanna called 911, Lawrence's family came to the scene looking for defendant, saying they were going to kill him and threatened to start killing people if someone did not tell them where he was. Dayanna averred that these statements scared her, so she told the police she did not see anything. She was later informed defendant's father's house was shot up. She stated she did not come forth earlier with the truth because she was afraid.

¶ 21    Jason Eatmon's affidavit stated that on May 23, 2015, around mid-evening, he was on Hedge Road and heard gunshots nearby. He walked toward a house with a bunch of people in the front and saw Lawrence lying on the ground. A few people surrounded Lawrence and Eatmon saw one of the individuals, who was tall with dreadlocks, pick up a gun that was lying next to Lawrence and take it to a gray four-door car parked in the driveway. Eatmon kept walking because he did not want the cops to bother him. He further stated that he forgot about this incident until he met defendant in prison.

¶ 22    One attached police report dated June 1, 2015, indicated the police were investigating an aggravated battery. After obtaining consent to search from Shawntell Brown, a police officer stated he searched a gray Ford Fusion with Tennessee plates, S43112H, and discovered a bullet hole in the front passenger seat which entered from the back of the seat and exited out the front of the passenger seat. The officer also found a 9-millimeter LUGER WIN stamped shell casing under the front passenger seat.

¶ 23    Several other police reports involving Lawrence were also attached. Many reports involved alleged drug offenses. One report indicated that Lawrence threatened to shoot a man if the man did not get the money he owed Lawrence. Another report included a statement from a witness that

8

Lawrence broke her rear glass sliding door to get into her house. A different police report indicated Lawrence resisted police after they arrived due to a call reporting shots fired at the residence.

¶ 24 Defendant's affidavit averred that on May 23, 2015, he was in a verbal altercation with Lawrence, who was threatening him. Defendant walked away and went around the back of his great-grandmother's house to smoke with his friend Smooth Rivers. Shortly after, he saw Lawrence coming toward him with a gun, Lawrence dropped the gun, and Rivers stated that Lawrence was trying to kill defendant. Defendant picked up the gun before Lawrence, but Lawrence continued to come toward him and threaten him. Defendant stated he felt scared and frantic and shot Lawrence because he feared for his life. He said when Lawrence fell to the ground, he dropped the gun and left. Defendant further stated that the affidavits and other evidence presented with his petition were unknown to him until recently and he presented them as timely as possible while incarcerated.

¶ 25 On February 16, 2022, the circuit court entered an order denying defendant leave to file a successive petition. It found that even if Rivers's affidavit stated the truth, it contradicted the testimony of numerous other witnesses and was not a monumental change from his trial testimony where both versions could arguably be relevant to a claim of self-defense. The court further found Rivers's affidavit was not new information because defendant would have known Rivers was lying at trial and if defendant used due diligence, he could have discovered Rivers felt threatened. The court also determined Dayanna Christmon's affidavit could have been procured prior to trial with due diligence and that her affidavit was not so conclusive that it would more likely than not change the outcome on retrial. The court found Eatmon's affidavit was new but would not have changed the outcome of the trial where he did not witness the shooting. Eaton's observation of someone near Lawrence grabbing the gun and putting it into a car added nothing to what happened at the

9

time of the shooting. With respect to the police reports and forensic evidence, the court determined that evidence of Lawrence's violent past did not equate with innocence. It further noted that the incidents outlined in the police reports occurred years prior to this crime and the reports could have been presented at trial. Defendant timely appealed, arguing that the circuit court erred in denying his motion for leave to file a successive postconviction petition because he presented a colorable claim of innocence.

¶ 26                                   II. ANALYSIS

¶ 27    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)) provides a means whereby a criminal defendant can collaterally attack his conviction when it resulted from a substantial denial of his federal or state constitutional rights. *Id.* § 122-1(a); *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). The Act allows the filing of only one petition without leave of court (725 ILCS 5/122-1(f) (West 2020)) and any claim not presented in the initial petition is waived. *Id.* § 122-3.

¶ 28    However, there are two exceptions to the bar against successive petitions. *People v. Harris*, 2024 IL 129753, ¶ 42. The first exception is where the petitioner establishes cause and prejudice from failing to raise the claim in an initial postconviction petition. *Id.* The second exception is to avoid a fundamental miscarriage of justice, which requires the petitioner to make a showing of actual innocence. *Id.*

¶ 29    Defendant here asserts the second exception. A postconviction claim of actual innocence can be based on evidence that supports a self-defense claim. See *People v. Sparks*, 393 Ill. App. 3d 878, 885-87 (2009); *Woods*, 2020 IL App (1st) 163031, ¶ 41. "Self-defense is a justifying or exonerating circumstance." *People v. Evans*, 277 Ill. App. 3d 36, 47 (1996) (citing 720 ILCS 5/7-1 (West 1992)).

10

¶ 30    "Because a successive postconviction claim of actual innocence undermines the finality of a conviction obtained after a fair trial, a postconviction petitioner seeking to file a claim of actual innocence is held to a high standard." *People v. Taliani*, 2021 IL 125891, ¶ 68. The evidence to support an actual innocence claim "must be new, material, noncumulative, and, most importantly, of such conclusive character as would probably change the verdict on retrial." *Harris*, 2024 IL 129753, ¶ 47. As explained in *People v. Griffin*, 2024 IL 128587, ¶ 35:

> " 'New' means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence. 'Material' refers to evidence that is relevant and probative of the petitioner's innocence. 'Noncumulative' evidence adds to what the jury heard. 'Conclusive' means the evidence, when considered along with the trial evidence, would probably lead to a different result."

¶ 31    If the petitioner fails to present a colorable claim of actual innocence, the court should deny leave. *Harris*, 2024 IL 129753, ¶ 43. Factual and credibility determinations are inappropriate for the leave-to-file stage. *Id.* ¶ 53. We must accept all affidavits as true unless they are positively rebutted by the record. *Griffin*, 2024 IL 128587, ¶ 59; *People v. Robinson*, 2020 IL 123849, ¶ 45. Dismissal of a successive postconviction petition without an evidentiary hearing is reviewed *de novo*. *People v. Pitsonbarger*, 205 Ill. 2d 444, 456 (2002) (citing *People v. Coleman*, 183 Ill. 2d 366, 389 (1998)).

¶ 32    The trial court here found many of the affidavits and police reports were not new evidence and none of the affidavits were of a conclusive character. Even assuming the attached evidence was new, we agree that such evidence was not of such conclusive character that it would have probably led to a different result on retrial.

11

¶ 33 The most important element of an actual innocence claim is the conclusive character of the evidence. *Harris*, 2024 IL 129753, ¶ 65. "Resolution of that issue requires that we ascertain whether the supporting affidavits raise the probability that it is more likely than not that no reasonable juror would have convicted petitioner." *Robinson*, 2020 IL 123849, ¶ 61. Evidence of total vindication or exoneration is not required. See *id.* ¶¶ 55-56. "Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Harris*, 2024 IL 129753, ¶ 43.

¶ 34 In her affidavit, Dayanna Christmon stated that Lawrence knelt down in the gray car to get something, but she in no way specified what Lawrence took from the car. While Jason Eatmon saw a man near Lawrence put the gun into a gray car after the shooting, Eatmon did not see any part of the crime and was not present before the shooting. Seeing someone take the gun after the fact has no bearing on the issue of self-defense.

¶ 35 Regarding Smooth Rivers's affidavit, we note that Rivers's testimony at trial provided circumstantial evidence in support of defendant's self-defense claim where he stated that Lawrence approached the men with a shiny foreign object in his hand. Nevertheless, his affidavit provides direct support for defendant's claim that Lawrence was the initial aggressor. However, such information was not so conclusive to potentially change the outcome on retrial.

¶ 36 None of the affidavits presented by defendant explain why defendant shot Lawrence multiple times, including shooting him from behind. On appeal and at trial, the State argued that—taking defendant's version of the events as true—his actions after he obtained the gun and Lawrence was unarmed and unstable did not exemplify reasonable force. In defendant's appeal brief, he acknowledged Lawrence was seen walking away from him when he fired the final shot. However, citing *People v. Celis*, 2022 IL App (2d) 210074-U, ¶ 22, he argues he was still acting

in self-defense because the encounter was ongoing, there was no pause or cool down period between the shots, and it was reasonable for defendant to believe Lawrence continued to pose an imminent threat to him.

¶ 37    It is true that the law does not require a person "to use inerrable judgment" when in reasonable apprehension of death or great bodily harm. *People v. White*, 87 Ill. App. 3d 321, 323 (1980). "It would be unreasonable to require such an exacting decision to be made in the space of a few seconds while one is fearful and under great stress." *Id.* However, "[t]he privilege of self-defense is negated where a person continues to use force beyond a point where, acting as a reasonable man, he would realize that further force is no longer necessary. This is true even where the action is continuous." *In re D.N.*, 178 Ill. App. 3d 470, 474 (1988).

¶ 38    Rivers's affidavit, and the other evidence attached to defendant's petition, fails to specify how many times defendant shot Lawrence and where defendant shot Lawrence. As such, none of the evidence presented by defendant disputes the medical evidence at trial that Lawrence was shot from behind. His evidence also does not dispute the several witnesses' testimonies that defendant shot Lawrence from behind after Lawrence walked away or his great-grandmother's testimony that defendant shot Lawrence after he fell to the ground. Defendant's continued shooting of Lawrence despite Lawrence moving away from defendant and eventual inability to stand went beyond defending himself. See *People v. Lewis*, 2015 IL App (1st) 122411, ¶ 70 ("defendant could not have reasonably continued to fear death or great bodily harm" to justify shooting the victim multiple times after the victim was disabled); *People v. Willis*, 210 Ill. App. 3d 379, 385 (1991) ("Even if defendant acted in self-defense in stabbing Cummings the first time, he acted unreasonably in stabbing Cummings ten more times after Cummings was injured, unarmed and turning away from defendant."); *People v. Zolidis*, 115 Ill. App. 3d 669, 676 (1983) (the

13

defendant's continued stabbing of the victim in the back after the victim was disabled and falling to the floor negates any claim of self-defense).

¶ 39    We find additional support for our conclusion in *People v. Woods*, 81 Ill. 2d 537, 543 (1980), which found that although the victim first punched the defendant, the defendant's subsequent, continuous blows to the victim despite the victim falling back and not throwing another punch did not require a self-defense instruction. Similar support is seen in *People v. Limas*, 45 Ill. App. 3d 643, 652 (1977), which found the defendant could not have reasonably continued to fear death or great bodily harm after the victim was struck with the first bullet and was therefore not justified in shooting the victim three more times. *Limas* noted that a person is not justified in using deadly force on an antagonist who has been disarmed or disabled. *Id.*; see also *People v. Lee*, 243 Ill. App. 3d 1038, 1043 (1993). Therefore, defendant's allegedly new evidence did not undermine the confidence of the judgment (*Robinson*, 2020 IL 123849, ¶ 56), and the circuit court did not err in denying leave to file a successive petition.

¶ 40                                III. CONCLUSION

¶ 41    Defendant failed to present a colorable claim of actual innocence. Accordingly, the circuit court did not err in denying defendant leave to file a successive petition.


¶ 42    Affirmed.

14