NOTICE
Decision filed 06/27/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 220184-UB

NO. 5-22-0184

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 93-CF-777 |
| | ) | |
| CHRISTOPHER ANTHONY, | ) | Honorable |
| | ) | John J. O'Gara, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Presiding Justice McHaney* and Justice Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court's dismissal of the defendant's successive amended postconviction petition is affirmed where the defendant failed to make a substantial showing of an actual innocence claim based on newly discovered evidence as the alibi evidence that he had presented was not conclusive. The trial court's dismissal of the successive amended postconviction petition is also affirmed where the defendant failed to make a substantial showing of a *Brady v. Maryland*, 373 U.S. 83 (1963), violation as the defendant's alibi evidence was not material.

¶ 2    The defendant, Christopher Anthony, appeals the second-stage dismissal of his successive amended postconviction petition by the circuit court of St. Clair County. On appeal, the defendant contends that the court erred in dismissing his petition without a third-stage evidentiary hearing because he made a substantial showing of an actual innocence claim with newly discovered

_____

*For administrative reasons Presiding Justice McHaney has been substituted on the panel for Justice Welch. Presiding Justice McHaney has read the briefs in this case.

1

evidence in the form of affidavits from alibi witnesses and that the State committed a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose that the alibi witnesses had given exculpatory statements to the investigating officer and by threatening these witnesses into remaining silent and not testifying at his trial.

¶ 3    In a decision entered July 11, 2024, we affirmed the circuit court's judgment, which dismissed the defendant's successive amended postconviction petition. The defendant then filed a petition for leave to appeal in the supreme court. On January 30, 2025, that petition was denied, but the court issued the following supervisory order:

"IT IS HEREBY ORDERED that the petition for leave to appeal is DENIED.

In the exercise of this Court's supervisory authority, the Appellate Court, Fifth District, is directed to vacate its judgment in case No. 5-22-0184 (07/11/24). The appellate court is directed to consider the effect of this Court's opinion in *People v. Harris*, 2024 IL 129753, on the issue of whether petitioner made a substantial showing of an actual innocence claim based on newly discovered evidence, and determine if a different result is warranted." *People v. Anthony*, No. 130955 (Ill. Jan. 30, 2025) (supervisory order).

¶ 4    Consequently, on March 7, 2025, pursuant to the Illinois Supreme Court's supervisory order, we vacated our prior judgment and ordered supplemental briefing on the impact of *Harris* on the present case. This decision will now stand as our disposition of this matter, and for the reasons stated below, we again affirm.

¶ 5                                 I. BACKGROUND

¶ 6    On September 10, 1993, the defendant was indicted for first degree murder and armed robbery for his part in the December 3, 1992, murder of Bobby Joe Connors, who was in the lobby

2

of Lum's Chop Suey, a carry-out Chinese restaurant in East St. Louis, and the armed robbery of Connors' fiancée, Sabrina Cosey, who was waiting for Connors in a car outside of the restaurant.

¶ 7                                    A. Trial

¶ 8    At the January 1994, bench trial, Cosey testified about the killing of Connors. Between approximately 10 p.m. and 10:15 p.m. on December 3, 1992, Connors and Cosey stopped at Lum's Chop Suey to get some takeout Chinese food. She first observed the defendant as he stood with two other men across the street from the restaurant. Connors left Cosey in the vehicle, went inside to order, and then returned to the car to wait for the food to be prepared. As they were waiting in the vehicle, the three men crossed the street and entered the restaurant. She identified the defendant as one of those men.

¶ 9    Shortly thereafter, Connors went back inside the restaurant to pick up their food, and Cosey remained in the vehicle. She could see Connors through a window of the restaurant. She saw the men approach Connors. One of the men then said something to Connors, and he responded. Then, they all moved out of her view, but Cosey heard three gunshots and saw Connors run out of the restaurant without his jacket (he had been wearing a jacket when he went inside). Connors ran to the car and told her to get out of the car and run. He then collapsed on the street.

¶ 10    The defendant followed Connors out of the restaurant and got inside the car with Cosey before she could get away. He pulled a gun on her and told her to shut up, be quiet, and not look at him, or he would kill her. He demanded her jewelry and money; he grabbed a gold chain from around her neck and her earrings from her ears and asked if that was everything she had. After she told him that she did not have anything else, he jogged across the street with the two other men. She observed the defendant face to face for one or two minutes in the front seat of the small vehicle.

3

An ambulance then arrived and took Connors to the hospital. Connors subsequently died from the gunshot wound.

¶ 11    A few days after the incident, Cosey identified the defendant in a photograph lineup at the jail. She also later identified the two other men involved in the shooting in a photograph lineup.

¶ 12    Tsou Fan Wang, a restaurant worker from Lum's Chop Suey who was working the night of the shooting, testified that a black man with a gun told a customer in the lobby to take off his jacket and hold up his hands. The man with the gun then pointed the gun at Wang and told her not to call anyone. Wang retreated to the kitchen, out of view of the men, and called 911. About 10 seconds later, she heard three gunshots. Wang later identified the man with the gun from a photograph lineup as the defendant, but at trial, she could not identify anyone in the courtroom as being the man who pointed the gun at her. However, Wang reaffirmed the photograph identification at the trial.

¶ 13    Sergeant Calvin Dye of the Illinois State Police testified that Cosey identified Keon Rose, through a photograph lineup, as one of the three men inside the restaurant on the night of the shooting. Sergeant Dye also noted that Wang identified the defendant, in a photograph lineup, as the man who attempted to rob Connors of his jacket and who pointed a gun at her.

¶ 14    Other testimony was presented at trial, which included testimony that Rose was arrested for an unrelated shooting, and a .38-caliber revolver was found near him. That weapon was later determined to be the murder weapon in this case. Also, the defendant testified that he did not know anything about the shooting and that he was at home with his family that night.

¶ 15    Subsequently, the trial court found the defendant guilty of first degree murder and armed robbery. Thereafter, he was sentenced to 40 years in prison on the armed robbery conviction and 80 years' imprisonment on the first degree murder conviction, sentences to run concurrently to one

4

another and consecutively to the 20-year prison sentence he was already serving for armed robbery. The defendant appealed his sentence only, and this court found the sentence appropriate and affirmed. *People v. Anthony*, No. 5-94-0174 (1995) (unpublished order under Illinois Supreme Court Rule 23).

¶ 16                              B. First Postconviction Petition

¶ 17    On November 25, 1995, the defendant filed a *pro se* postconviction petition, raising unrelated issues to those raised in the successive postconviction petition at issue here. The circuit court subsequently appointed counsel to represent him on the postconviction petition. However, the court ultimately granted the State's motion to dismiss, finding that the postconviction claims were forfeited, subject to *res judicata*, or otherwise based on conclusory allegations. This court affirmed the dismissal at the second stage, finding that the defendant's allegations were insufficient to warrant a third-stage evidentiary hearing. *People v. Anthony*, No. 5-97-0918 (2000) (unpublished order under Illinois Supreme Court Rule 23).

¶ 18                          C. First Successive Postconviction Petition

¶ 19    On April 19, 2001, the defendant filed a *pro se* petition for a writ of *habeas corpus*, arguing, among other things, that his trial counsel was ineffective for failing to interview and subpoena Trinetta Franks, who would have provided him with an alibi during the hour of the shooting.[1] However, the defendant did not attach an affidavit from Franks to his petition. The circuit court treated the defendant's *pro se* pleading as a postconviction petition and dismissed it at the first stage of the postconviction proceedings. The defendant appealed the dismissal. This court subsequently granted appellate counsel's motion to withdraw pursuant to *Pennsylvania v.*

---

[1]Franks was not one of the alibi witnesses who provided an affidavit in the successive postconviction proceedings at issue here.

5

*Finley*, 481 U.S. 551 (1987), finding that the defendant's successive petition was frivolous and patently without merit. *People v. Anthony*, No. 5-01-0719 (2003) (unpublished order under Illinois Supreme Court Rule 23).

¶ 20                    D. Second Successive Postconviction Petition

¶ 21    On August 26, 2010, the defendant filed a *pro se* postconviction petition based on newly discovered evidence, which is the pleading at issue in this appeal. In the *pro se* petition, the defendant acknowledged that this issue had not been raised in his previous filings, but he argued that the issue could not have been raised previously because the newly discovered evidence was not available at that time. The defendant indicated that two members of his family, his mother, Mary Anthony, and his cousin, Michael Foster, had recently come forward to disclose evidence that was never disclosed to him or to his trial counsel, even though it was given to the investigating detective. He argued that the State deliberately withheld this exculpatory evidence to keep these witnesses from coming forward as alibi witnesses. Attached to the *pro se* petition were the affidavits from the defendant's mother, the defendant, and the defendant's cousin.

¶ 22    Mary Anthony's affidavit dated June 10, 2010, indicated that, on December 3, 1992, she attended a family gathering at the defendant's home with several other family members, and she was there from 10 p.m. until 11 p.m. The defendant did not leave at any point during the gathering. In September 1993, she voluntarily gave a statement to the police investigating the shooting about where the defendant was that night. However, beginning in November 1993 and leading up until the defendant's conviction, law enforcement officers physically threatened her to keep her from revealing that she was an alibi witness. The officers accosted her and confronted her at her home and in public. She never disclosed the threats to the defendant, the defendant's attorney, or the trial court. She would have come forward earlier about the defendant's location on the night of the

6

shooting and about the physical threats if she had not been harassed, terrorized, and in fear for her life.

¶ 23　The defendant's affidavit dated June 30, 2010, indicated that he had received letters from his mother and cousin in January 2010 revealing that, before his trial, they voluntarily gave statements to a law enforcement officer about where the defendant was on the night of the shooting. This was the first time that he had heard about them giving statements. However, these letters were subsequently destroyed during a search of his prison cell.

¶ 24　Michael Foster's statement dated August 27, 2009, which was not notarized but contained a declaration pursuant to section 1-109 of the Code of Civil Procedure (735 ILCS 5/1-109 (West 2008)), indicated that he attended the family gathering at the defendant's home on December 3 from 10 p.m. until 11:30 p.m. The defendant did not leave the house at any time during the gathering. After learning that the defendant had been charged with Connors' murder and Cosey's armed robbery, he voluntarily gave a statement to Detective Lenzie Stewart about where the defendant was that night; he gave the statement in September 1993. Thereafter, and up until the time of the defendant's conviction, Foster was physically threatened and harassed by various law enforcement officers, both in public and at his home. They threatened his life and threatened to charge him as an accomplice in the shooting if he ever disclosed the fact that he had given a statement to either the defendant or the defendant's attorney. They also threatened him so he would not appear at the trial proceedings if he was subpoenaed. Foster never disclosed the fact that he gave the statement or the threats to anyone because he feared for his life and feared being falsely convicted in the shooting.

¶ 25　On September 16, 2010, the trial court entered an order, finding that the defendant made a claim of actual innocence, ordered the defendant's *pro se* petition docketed for further

7

proceedings, and appointed counsel to represent him. On October 1, 2010, the defendant filed a *pro se* supplemental postconviction petition raising, *inter alia*, a freestanding actual innocence claim based on the affidavits of his mother and cousin.

¶ 26 On January 26, 2011, the defendant filed another *pro se* supplemental petition based on newly discovered evidence. Attached to this petition was an affidavit from the defendant's brother, Clarence Anthony, which was dated November 19, 2010, wherein Clarence also revealed that he was threatened by law enforcement officers when he came forward as an alibi witness for the defendant. Clarence also claimed that he never disclosed the fact that he made a written statement to the defendant or to the defendant's counsel because of the threats.

¶ 27 On February 1, 2011, the defendant filed a motion to withdraw Michael Foster's affidavit because it was not notarized. The circuit court did not rule on this motion, but the parties and the court addressed the contents of this affidavit in later proceedings.

¶ 28 Between May 2011 and February 19, 2019, the case was repeatedly continued, and the defendant submitted multiple requests for information on its status. On February 19, 2019, the defendant's appointed counsel filed a motion for clarification and for extension of time, advising that he had resigned from his employment as special counsel for postconviction petitioners and that new counsel should be appointed for the defendant. On July 18, 2019, the trial court appointed new postconviction counsel.

¶ 29 Thereafter, following another series of continuances, which included the COVID-19 shutdown, the defendant's counsel filed an amended petition on July 17, 2020. In the amended petition, counsel argued that the defendant had an actual innocence claim based on the three affidavits establishing an alibi defense that would have been available but for the conduct of the investigating officer. The amended petition also argued that the State committed a *Brady* violation

by suppressing exculpatory evidence, specifically the statements of the defendant's mother, cousin, and brother. The petition contended that, had these witnesses been disclosed to the defendant's counsel, they would have supported his alibi defense in the face of weak identification testimony.

¶ 30    On August 21, 2020, the State filed a motion to dismiss, which argued that the defendant's claims were barred by *res judicata*. Specifically, regarding the actual innocence claim, the State argued that the specific evidence was not newly discovered, and it would not change the result on retrial. The State denied the allegation that it had suppressed exculpatory evidence, noting that there was no evidence that it had acted in bad faith. The State noted that the only affidavit that was actually written by the affiant was Michael Foster's affidavit. The other two affidavits were authored by the defendant in his own handwriting, but they were written from the point of view of the affiants and were signed by them. Noting that the affidavits were dated August 27, 2009, November 19, 2010, and June 10, 2010, the State expressed confusion as to why it took the three witnesses nearly two decades to come forward as alibi witnesses since the defendant knew about them at the time of trial. Although the State recognized that the witnesses made claims of threats and harassment against them, the State argued that bare allegations of police intimidation or misconduct without evidence in support were unfairly distortive and without merit. The State contended that the defendant's claim of a *Brady* violation was barred by *res judicata*, was refuted by the record, and was simply without merit.

¶ 31    On September 22, 2020, the defendant's counsel filed a response to the State's motion to dismiss and a certificate of compliance pursuant to Illinois Supreme Court Rule 651(c) (eff. July 1, 2017). In the response, counsel argued that the defendant's actual innocence claim should not be analyzed as a freestanding claim of actual innocence because the exculpatory evidence was

withheld and suppressed by police. Thus, the defendant contended that it amounted to a constitutional violation in its own right that took it outside the purview of a freestanding actual innocence claim.

¶ 32    The defendant also contended that his *Brady* claim was not barred by *res judicata* because none of the evidence concerning the suppression of the statements from the alibi witnesses was in the trial record or available to the defendant until the affiants came forward in 2009 and 2010. The defendant noted that, while the State may argue that the defendant was aware of his alibi defense, it cannot argue that he was aware of the State's suppression of the three statements before his trial or of the efforts by the State actors to threaten and intimidate the witnesses from testifying. Thus, the defendant contended that these arguments could not have been raised in his direct appeal or in his first postconviction petition. Moreover, the defendant argued that the suppressed alibi evidence of three witnesses would undermine the confidence in the outcome of his trial as his conviction was based on weak and contradictory eyewitness identification.

¶ 33    On October 21, 2020, the trial court held a hearing on the amended successive postconviction petition. During the hearing, the State argued that the defendant failed to show that the evidence was newly discovered, material and noncumulative, and of such character that the result on retrial would likely be different. The State noted that the defendant had presented affidavits from three different individuals claiming to have been harassed and threatened by state actors, which was the reason they did not come forward earlier. However, the State argued that an allegation was not true just because it was made, and there was no evidence presented to corroborate the claims.

¶ 34    In response, the defendant's counsel argued that, if the claim was a freestanding actual innocence claim, there would be a much higher hurdle to overcome. However, counsel argued that,

10

in examining the defendant's contentions, "[we are] dealing with *** allegations that are supported by affidavit of suppression of exculpatory evidence on the behalf of law enforcement." Counsel acknowledged that the defendant knew that he had an alibi defense but argued that he did not have notice of the efforts by law enforcement to suppress the exculpatory statements of his alibi witnesses. Counsel noted that the suppressive activity included not telling the prosecution about the witnesses and threatening the three witnesses against testifying. Thus, counsel argued that there was a *Brady* violation in that exculpatory information was deliberately suppressed and requested that the court view it as a *Brady* claim rather than as a freestanding actual innocence claim that could have been brought earlier. Defense counsel then contended that the claim was not available until the affidavits were produced and that, taking them as true, there was a reasonable probability that the outcome of the trial would have been different had the witnesses testified, which was a much lower bar than a freestanding actual innocence claim.

¶ 35    The State then argued that the affidavits from the witnesses were not credible because it took so long for them to come forward, and two of the three affidavits were written in the defendant's own handwriting and from his own point of view. After hearing argument, the trial court took the matter under advisement.

¶ 36    On December 8, 2020, the trial court entered a written order, dismissing the defendant's amended successive postconviction petition. In the order, the trial court found that the defendant's actual innocence claim was not based on newly discovered evidence, noting that the defendant's counsel conceded this at the hearing. The trial court also found that the evidence was not credible. The trial court noted that the defendant presented three affidavits from his family members who claimed to have been with the defendant at a family gathering on the night of the shooting. However, the trial court found that there was no doubt that the defendant knew about his alibi at

11

trial, which suggested that reasonable diligence could have resulted in the presentation of their testimony at his trial. The trial court further noted that, while the affidavits indicated that the witnesses were intimidated and threatened into not coming forward with their testimony, there was no explanation as to why the defendant's counsel did not attempt to subpoena them since the defendant would have known their identities.

¶ 37 The trial court found this case similar to *People v. Edwards*, 2012 IL 111711, ¶¶ 35-37, in which the supreme court analyzed an analogous situation where defendant knew of the alibi at the time of trial, but the witnesses were not voluntarily willing to come forward to testify. However, the supreme court noted that there was no attempt to subpoena them, and no explanation as to why subpoenas were not issued. *Id.* ¶ 36. The supreme court concluded that the efforts expended were insufficient to satisfy the due diligence requirement, that the alibi evidence could have been discovered earlier through the exercise of due diligence, and that the evidence therefore was not newly discovered. *Id.* ¶ 37. Similarly, in the present case, the trial court found that the defendant was fully aware of his alibi defense, but he had offered no explanation as to why he did not attempt to subpoena the alibi witnesses to testify. Thus, the trial court found that the evidence was not newly discovered, and the defendant's freestanding actual innocence claim failed.

¶ 38 As to the defendant's *Brady* claim, the trial court noted that it was incredible that the alibi witnesses did not complain of law enforcement coercion until almost two decades after the defendant's trial. The court also noted that only one witness mentioned specific police officers, and no evidence was provided that the State or state actors suppressed this evidence. The court then found that, although the defendant encouraged the court to analyze the claim pursuant to *Brady*, the appropriate standard to evaluate the claim was as an actual innocence claim. Applying that standard, the court found that the defendant had not presented newly discovered evidence, that

12

was material and noncumulative, and that was of such conclusive character that it would probably change the result on retrial. Thus, the court concluded that the defendant had not presented sufficient facts and allegations that would support his assertion of State suppression of material evidence or witness testimony. The court, therefore, concluded that the defendant failed to make a substantial showing of a violation of his constitutional rights and dismissed his amended successive petition.

¶ 39    On January 11, 2021, the defendant filed a *pro se* petition for rehearing, asking the trial court to reconsider the dismissal of his postconviction petition. On February 28, 2022, the trial court denied the defendant's *pro se* motion as untimely and lacking substantive grounds for reconsideration. On March 22, 2022, the defendant filed a notice of appeal. Since the defendant's *pro se* petition for rehearing was file stamped January 11, 2021, more than 30 days after the dismissal of his amended postconviction petition, his counsel filed a motion for a supervisory order in the Illinois Supreme Court, seeking to perfect jurisdiction for appeal. On October 31, 2022, the supreme court entered a supervisory order, instructing this court to treat the defendant's notice of appeal as a properly perfected appeal from the dismissal of his postconviction petition.

¶ 40                                    II. ANALYSIS

¶ 41    On appeal, the defendant argues that his successive postconviction petition made a substantial showing of an actual innocence claim with newly discovered evidence in the form of affidavits from his alibi witnesses. The defendant also contends that his petition made a substantial showing that the State violated its obligation to disclose exculpatory evidence and engaged in threatening behavior to prevent his alibi witnesses from testifying.

13

¶ 42                                    A. Postconviction Rules

¶ 43    The Post-Conviction Hearing Act (Act) allows an incarcerated defendant to challenge his conviction by asserting that his conviction was the result of a substantial denial of his constitutional rights. 725 ILCS 5/122-1 (West 2018). The Act sets forth a three-stage process for adjudicating defendant's claims. *People v. Cage*, 2013 IL App (2d) 111264, ¶ 9. At the first stage, the circuit court independently reviews the petition to determine whether it is frivolous or is patently without merit. *Id.*; 725 ILCS 5/122-2.1 (West 2018).

¶ 44    If the petition is not dismissed for being frivolous or patently without merit, it advances to the second stage of the proceedings, at which an indigent defendant is entitled to appointed counsel, the petition may be amended, and the State may answer or move to dismiss. *People v. Thomas*, 2013 IL App (2d) 120646, ¶ 5. At this stage, the circuit court must determine whether the petition and any accompanying documentation make a substantial showing of a constitutional violation. *People v. Dupree*, 2018 IL 122307, ¶ 28. If no such showing is made, the petition is dismissed. *Id.* If, however, a substantial showing of a constitutional violation is set forth, the petition is advanced to the third stage, where the circuit court conducts an evidentiary hearing. *Id.*

¶ 45    At the second stage, the inquiry into whether the postconviction petition contains sufficient allegations of constitutional deprivations does not require the circuit court to engage in any fact-finding or credibility determinations. *Id.* ¶ 29. These determinations will instead be made at the evidentiary stage of the litigation. *Id.* Also, the court examines the petition to determine its legal sufficiency and any allegations not affirmatively refuted by the record must be taken as true. *Id.*

¶ 46    In this case, the petition at issue was a successive petition. The Act contemplates the filing of only one postconviction petition. 725 ILCS 5/122-1(f) (West 2018); *People v. Edwards*, 2012 IL 111711, ¶ 22. Generally, any claims of substantial denial of constitutional rights that are not

14

raised in the first petition are forfeited. 725 ILCS 5/122-3 (West 2018). However, there are two bases upon which the bar against successive petitions has been relaxed for fundamental fairness. *People v. Taliani*, 2021 IL 125891, ¶ 55. The first is the cause and prejudice test, which is codified in the Act. 725 ILCS 5/122-1(f) (West 2018). The second exception is the fundamental miscarriage of justice exception which requires defendant to demonstrate actual innocence. *Taliani*, 2021 IL 125891, ¶ 55.

¶ 47    Under the cause and prejudice exception, leave of court may only be granted if "a petitioner demonstrates cause for his or her failure to bring the claim in his or her initial post[ ]conviction proceedings and prejudice results from that failure." 725 ILCS 5/122-1(f) (West 2018). If the circuit court determines that a showing of cause and prejudice has been made and allows the successive petition to be filed, then the petition advances to the three-stage process under the Act. *People v. Bailey*, 2017 IL 121450, ¶ 26. At second-stage postconviction proceedings, the State may move to dismiss the successive postconviction petition on any grounds, including defendant's failure to show cause and prejudice for not raising the claims in the initial postconviction petition. *Id.* ¶ 18. A claim of actual innocence in a successive petition need not meet the cause-and-prejudice test. *People v. Ortiz*, 235 Ill. 2d 319, 330 (2009).

¶ 48    The defendant's successive petition was dismissed at the second stage. The dismissal of a postconviction petition without an evidentiary hearing is reviewed *de novo. People v. Sanders*, 2016 IL 118123, ¶ 31.

¶ 49                              B. Actual Innocence Claim

¶ 50    A freestanding actual innocence claim raised in a successive postconviction petition is an extraordinary remedy. *People v. Coleman*, 2013 IL 113307, ¶ 94. For defendants seeking to file a successive postconviction petition based on actual innocence, leave of court should only be denied

15

where it is clear, from a review of the successive petition and the documentation submitted by defendant, that, as a matter of law, defendant cannot set forth a colorable claim of actual innocence. *People v. Harris*, 2024 IL 129753, ¶ 43. When a defendant, through his supporting documentation, raises the probability that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence, the court should grant defendant leave to file the successive petition. *Id.*

¶ 51    To succeed on a claim of actual innocence, the evidence of actual innocence must be (1) newly discovered, (2) not discoverable earlier through the exercise of due diligence, (3) material and not merely cumulative, and, most importantly, (4) of such conclusive character that it would probably change the result on retrial. *Sanders*, 2016 IL 118123, ¶ 24. Newly discovered evidence is evidence that was discovered after the trial and that could not have been discovered earlier through the exercise of due diligence. *People v. Robinson*, 2020 IL 123849, ¶ 47. Evidence is material if it is relevant and probative of defendant's innocence. *Id.* Noncumulative evidence adds to the information that the fact finder heard at trial. *Id.* Moreover, the conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result. *Id.* This last element is the most important element of an actual innocence claim. *Id.*

¶ 52    The ultimate question for an actual innocence claim is whether the newly discovered evidence places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. *Id.* ¶ 48. The new evidence need not be entirely dispositive; and probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the trial evidence along with the new evidence. *Id.*

16

¶ 53                          1. *Claim Fails for Lack of Support*

¶ 54    Initially, in its appellee brief filed before remand, the State contended that the defendant's actual innocence claim failed for lack of support because, although the alibi witness affidavits were attached to the defendant's *pro se* successive postconviction petition, they were not attached to the amended petition filed by his counsel, nor were they incorporated by reference into the petition. However, as in our previous decision that was vacated, we again find that the State has forfeited this argument on appeal because it was not raised in either the State's written motion to dismiss or at the hearing on the motion to dismiss. See *People v. Cruz*, 2013 IL 113399, ¶ 20. Moreover, we note that the allegations in the defendant's successive amended postconviction petition were based on these affidavits, postconviction counsel referenced the affidavits in the amended petition, the State specifically addressed the substantive allegations made in the affidavits when making its arguments in support of dismissal, and these arguments were relied on by the trial court when it dismissed the petition. Thus, we reject the State's argument that the actual innocence claim fails for lack of support.

¶ 55                          2. *Discussion of People v. Harris*

¶ 56    Since we reject the State's argument that the actual innocence claim fails for lack of support, we now turn to the issue of whether the defendant has presented a colorable claim of actual innocence. We previously held that the evidence that the defendant presented was not newly discovered where the defendant's successive amended postconviction petition and alibi witness affidavits did not establish that the alibi witnesses, who were the defendant's family members, could not have been made available at the defendant's trial through the exercise of due diligence. However, in complying with the supreme court's directive, we now analyze its recent decision in *People v. Harris*, 2024 IL 129753, to determine whether a different result in this case is warranted.

¶ 57    In *Harris*, a jury convicted defendant of two counts of first degree murder for the shooting deaths of two individuals, and the trial court subsequently sentenced defendant to a mandatory term of life in prison. *Id.* ¶ 1. After an unsuccessful direct appeal and an initial postconviction petition, defendant filed a motion for leave to file a successive postconviction petition under the Act, alleging, in part, that he had newly discovered evidence of his actual innocence. *Id.* Defendant attached an affidavit from Wynton Collins, in which Collins averred that he witnessed the shooting and identified a different person as the individual who shot and killed the victims, Armstrong and Turner. *Id.* Collins indicated that he did not come forward earlier because he feared for his safety and that of his family. *Id.* The circuit court denied defendant's motion for leave to file a successive petition, finding that the petition was without merit as Collins's affidavit did not explain how Collins came to light and whether trial counsel was aware of Collins at the time of the trial. *Id.*

¶ 58    The appellate court affirmed, finding that defendant did not establish that Collins's testimony could not have been discovered earlier through the exercise of due diligence. *Id.* ¶ 2. The court noted that, given Collins's position at the scene of the shooting, he would have been visible, both before and after the shooting, to the two witnesses who testified at trial that defendant was the shooter. *Id.* ¶ 36. The appellate court found that there was no evidence in the record that defendant attempted to ascertain who was at the scene besides the two testifying witnesses and that defendant failed to explain why Collins could not be identified or located sooner. *Id.* ¶ 37. Thus, the appellate court found that defendant failed to allege that he made a diligent effort to locate or identify Collins earlier. *Id.* The appellate court also found that defendant failed to allege he only found out about Collins's evidence when he met him in prison and that Collins did not aver that he was unavailable and could not be located. *Id.* The appellate court acknowledged that Collins attested that he did not come forward because he was afraid of the actual shooter, but the

18

appellate court concluded that neither defendant nor Collins averred Collins would not have offered his affidavit earlier had defendant tried to find him. *Id.* Accordingly, the appellate court concluded that defendant failed, as a matter of law, to make a colorable claim of actual innocence and that the circuit court did not err in denying him leave to file a successive petition on that basis. *Id.*

¶ 59   On appeal to the supreme court, defendant argued that he presented a colorable claim of actual innocence by presenting Collins's affidavit, which established that someone other than defendant had committed the shootings, defendant did not meet Collins until they were incarcerated together, and Collins did not come forward sooner because he was afraid of the actual shooter. *Id.* ¶ 40. He argued that Collins could not have been discovered as a witness before trial because he was an " 'unknown, unobserved, and unrecorded' " witness who was unavailable due to his fear of the actual shooter. *Id.*

¶ 60   The supreme court found that the appellate court's analysis about Collins being visible to the two testifying witnesses at the time of the shooting was speculative, made factual determinations about what the two testifying witnesses were able to observe, and placed a greater burden on defendant than was required at the leave-to-file stage. *Id.* ¶ 53. The supreme court noted that factual and credibility determinations should not be made at the leave-to-file stage. *Id.* Also, the supreme court found that the record did not support the appellate court's findings that Collins could have been discovered at the time of trial. *Id.* ¶ 54. The supreme court noted that there was no indication in the record that either witness would have seen Collins, either before or after the shooting, since there were many people at the park near where the incident occurred, and, after the shooting, the scene was chaotic, and one witness immediately fled. *Id.* ¶¶ 54-55. The supreme court determined that, under these circumstances, Collins was an unknown, unobserved, and

unrecorded witness, and no amount of due diligence would have forced him to come forward before trial. *Id.* ¶ 55. The supreme court then noted that a court could not speculate as to what a witness saw or did not see, unless such facts were indisputable from the record. *Id.* ¶ 58. Thus, the supreme court refused to speculate as to what the two testifying witnesses saw beyond what they testified to in court. *Id.*

¶ 61 Regarding establishing due diligence, the supreme court declined to adopt an approach that would require a postconviction defendant to show cause for failing to raise the actual innocence claim in the initial postconviction petition. *Id.* ¶ 60. Thus, the supreme court concluded that a court should only consider whether the newly discovered evidence that defendant presented in support of his actual innocence could have been discovered before trial. *Id.* ¶ 61.

¶ 62 The supreme court then analyzed whether the newly discovered evidence was conclusive. *Id.* ¶ 63. The supreme court noted that "conclusive" meant that the evidence, when considered along with the trial evidence, would probably lead to a different result. *Id.* ¶ 65. The conclusive element only required that defendant present evidence that placed the trial evidence in a different light and undermined the court's confidence in the judgment of guilt. *Id.* "Probability, not certainty, is the key, as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *Id.* Taking the statements in Collins's affidavit as true, the supreme court found that there was a probability that a jury would reach a different result. *Id.* ¶ 66. There was no forensic evidence linking defendant to the shootings, and the State's case rested on the testimony of two witnesses who identified defendant as the shooter. *Id.* The court noted that the first witness only saw the shooter for 5 to 10 seconds and only saw the shooter's hair, complexion, and eyes as the shooter may have been wearing a mask on the lower part of his face. *Id.* In addition, the court noted that the second witness was using heroin daily, had

a beer sometime before the shooting, and was diagnosed with paranoid schizophrenia but was not taking any medicine. *Id.* ¶ 67.

¶ 63 The supreme court also noted that Collins's affidavit was consistent with the trial record as to the location and time of the shooting, and it provided an additional eyewitness who was familiar with the person he identified as the shooter and who was in a position to clearly observe the shooting. *Id.* ¶¶ 68, 69. The supreme court found that, although it could not weigh the credibility of the trial witnesses against Collins's account at the leave-to-file stage, with no forensic evidence connecting defendant to the crime, a jury could determine that Collins's proposed testimony exculpated defendant as the shooter and refuted the testimony of the two witnesses. *Id.* ¶ 69. Thus, the court found that, in light of Collins's proposed testimony, it was more likely than not that no reasonable juror would have convicted defendant. *Id.*

¶ 64                    3. *Newly Discovered Evidence Analysis*

¶ 65 In the present case, the defendant argues that the affidavits of his three alibi witnesses qualify as newly discovered evidence. In his supplemental brief upon remand, he contends that the ultimate question for whether evidence is newly discovered is not what the defendant did to make the evidence available, but whether the evidence could have been made available at trial through reasonable efforts. He argues that his petition, with the accompanying affidavits, shows that reasonable efforts could not have made this information available at trial because the police suppressed the witnesses' statements and terrorized them into silence so that they would not even testify truthfully if subpoenaed. Thus, the evidence is newly discovered because the defendant could not have forced the witnesses to testify truthfully even if he tried.

¶ 66 Although the defendant concedes that it is not an unreasonable assumption that he would have known about the alibi witnesses before the trial since he testified that he was with family

21

members on the night of the shooting, he argues that assumptions are prohibited at the second stage of the postconviction proceedings. Moreover, the defendant contends that the record did not contain any further details about his knowledge or memory of that night or about his relationships and communications with these or other family members at that time. However, even assuming he knew these particular family members could corroborate his alibi, and assuming he had attempted to get them to come forward, and he had believed it was suspicious that they would not assist him, defendant argues the allegations in his successive amended postconviction petition still show that these witnesses could not have been compelled to testify truthfully on his behalf.

¶ 67    In support of his position, the defendant cites *People v. Ayala*, 2022 IL App (1st) 192484, ¶ 135, which also addressed the issue of whether affidavits of potential witnesses at trial were considered newly discovered when defendant knew about them, but the witnesses were unavailable to testify because of State misconduct. There, the appellate court found that one witness was unavailable at trial because he asserted his fifth amendment right against self-incrimination. *Id.* ¶ 136. The court noted that it was well settled that no amount of diligence could force a witness to violate their fifth amendment right to avoid self-incrimination if the witness did not choose to do so. *Id.*

¶ 68    The appellate court also found that defendant's allegations of State coercion and affiant's averments of fear of State retaliation were sufficient to deem certain witnesses unavailable to testify at trial. *Id.* ¶ 137. In making this decision, the appellate court noted that newly discovered evidence included testimony from a witness who essentially made himself unavailable as a witness out of fear of retaliation. *Id.* The appellate court then noted that the identified witnesses had averred that they were baselessly arrested for participating in the offense, threatened, physically abused by the police, and feared being prosecuted for the murders. *Id.* The court found that the legitimacy of

22

the affiants' fears and whether they rendered these witnesses unavailable to testify at trial should be ascertained at an evidentiary hearing to determine their credibility. *Id.* Thus, the appellate court concluded that these affidavits were newly discovered. *Id.* ¶ 143. Similarly, the defendant in the present case contends that the alibi witnesses essentially made themselves unavailable as witnesses out of fear of retaliation, and any questions about the legitimacy of their fears and whether they rendered these witnesses unavailable to testify at trial should be resolved at an evidentiary hearing.

¶ 69    In response, the State argues that, taking the allegations in the alibi affidavits as true, the defendant knew that his mother, brother, and cousin could provide alibi testimony at his trial since they were all together at the time of the shooting. In support of this argument, the State points to the affidavits, in which all three witnesses averred that they were with the defendant at his house on the night of the shooting, and the defendant's cousin averred that the defendant never left his presence that night. The State also noted that the defendant testified at trial that he was with family at the time of the shooting. Thus, unlike in *Harris*, the defendant's alibi witnesses were not unknown and unobserved witnesses.

¶ 70    The State contends that, nevertheless, the defendant never subpoenaed those witnesses, and he offered no explanation as to why he did not attempt to subpoena them. The State contends that, even if we find that *Harris*'s determination that an alibi witness's averment that he did not come forward and testify at trial because he was afraid meant that no amount of due diligence would have forced the witness to come forward, the defendant still failed to make a showing of newly discovered evidence because the defendant's alibi witnesses were not unknown and unobserved witnesses.

¶ 71    After reconsidering the record upon remand, we now conclude that the alibi witnesses' affidavits were newly discovered. The defendant testified that he was at home with family on the

23

night of the shootings. Consistently, the three alibi witnesses averred that they were all at the defendant's home for a family gathering, and the defendant neither left the home nor was outside the family's presence. Based on this evidence, it is a reasonable inference that the defendant knew that his mother, brother, and cousin had all observed him at his house on the same night and during the same time that he was accused of committing the murder. However, we cannot speculate as to what the defendant actually knew or what he did or did not do in an attempt to get them to testify on his behalf. Although the defendant testified that he was with family, he never identified who he was with that night, and the record does not contain any details about the nature of his relationships and his communications with the specific family members who submitted affidavits on his behalf.

¶ 72    Moreover, the affidavits, which are to be taken as true, all indicated that the witnesses were threatened and coerced into remaining silent by state actors. Thus, like the witnesses in *Ayala* who essentially made themselves unavailable out of fear of retaliation, the alibi witnesses here also made themselves unavailable as witnesses after being threatened and intimidated by police officers. Newly discovered evidence includes testimony from a witness who essentially made himself unavailable as a witness out of fear of retaliation or who was made unavailable through threats or intimidation to not testify. *Ayala*, 2022 IL App (1st) 192484, ¶ 137. Thus, even if the alibi witnesses were known and observed, there was no amount of due diligence that could have forced them to come forward or to get involved during the defendant's trial. Accordingly, after carefully reconsidering the record upon remand, we conclude that this evidence was newly discovered.

¶ 73                                                    4. *Conclusive*

¶ 74    The defendant contends that, taking the allegations in the affidavits as true, there is a probability that a different result would have been reached at trial. First, the defendant notes that

here, like in *Harris*, there was no forensic evidence tying him to the crime scene. Second, the defendant argues that, although he was identified by two witnesses, he has come forward with three new alibi witnesses whose testimony is not rebutted by the record, is consistent with each other, and is consistent with his own alibi testimony at trial. Third, he argues that Wang, the restaurant employee, was unable to identify him at trial. Regarding Cosey, the defendant acknowledged that she did identify him at trial but noted that her fiancé had just been fatally shot, and she only saw the shooter for a brief duration while the shooter was holding a gun on her, which could impact her ability to make a credible identification.

¶ 75     When analyzing conclusiveness, the relevant question is whether it is more likely than not that no reasonable juror, hearing and believing the newly discovered evidence, alongside all the other evidence presented at trial, could convict defendant. *People v. Brooks*, 2021 IL App (4th) 200573, ¶ 44. At the second stage of the postconviction proceedings, we must take all well-pleaded facts in defendant's petition and in the affidavits that are not positively rebutted by the record as true. *People v. Watson*, 2022 IL App (5th) 190427, ¶ 33. Thus, the court must determine only whether the new evidence, if believed and not positively rebutted by the record, could lead to acquittal on retrial. *Robinson*, 2020 IL 123849, ¶ 60.

¶ 76     During the trial in this case, testimony was presented that Cosey positively identified the defendant in a photograph lineup that occurred a few days after the incident as the man who jumped in her fiancé's car and robbed her at gunpoint. Although the defendant contends that her identification was unreliable because she was being held at gunpoint, and her fiancé had just been fatally shot, she was also able to identify the remaining two suspects that were involved in the shooting—one of which was found, weeks later, with the weapon used during the shooting. Also, Wang identified the defendant in a photograph lineup as the man who pointed a gun at her in the

25

restaurant. Although Wang could not identify anyone in the courtroom as being the person who pointed the gun at her, she reaffirmed the photographic identification at trial.

¶ 77    The defendant testified at trial that he was at home with his family on the night of the shooting, and the affidavits now corroborate his testimony. However, even taking these affidavits as true, which we are required to do at this stage in the proceedings, we conclude that this evidence was not of such conclusive character that it would probably change the result on retrial. Similar to *Harris*, there was no forensic evidence linking the defendant to the shooting. However, unlike *Harris* where one eyewitness only saw the shooter's hair, complexion, and eyes for 5 to 10 seconds, Cosey was face to face with the defendant in the small confines of a vehicle. Also, unlike *Harris*, there was nothing in the record to indicate that Wang, who affirmatively placed the defendant inside the restaurant during the shooting, or that Cosey, were somehow impaired during the period of time they had the opportunity to observe the defendant in the restaurant. Thus, we conclude that, considering the new evidence along with the trial evidence, there is no probability that a different result would be reached on retrial with the newly discovered evidence.

¶ 78                                          C. *Brady* Claim

¶ 79    Initially, in its supplemental brief on remand, the State asks us to strike the portions of the defendant's supplemental brief that provides argument on a wholly separate issue from his actual innocence claim, the *Brady* claim. The State argues that the supreme court directed this court to consider the effect of its opinion in *Harris* on the issue of whether defendant made a substantial showing of an actual innocence claim based on newly discovered evidence and determine if a different result is warranted. However, notwithstanding that specific instruction, the defendant provides argument in his supplemental brief to support his *Brady* claim. The State contends that we have no authority to go beyond the dictates of the supreme court's mandate and asks us to strike

26

those portions of the defendant's brief. However, although the supreme court's mandate was specific to the actual innocence claim, by vacating our prior judgment in this case, the *Brady* claim remains pending. Thus, we also need to issue a ruling and enter judgment on that claim, whether or not that results in the same outcome as our original decision. Accordingly, we will not strike those portions of the defendant's supplemental brief addressing the *Brady* claim. However, we will also consider the State's arguments set forth in its supplemental brief on this issue.

¶ 80    We now address the defendant's claim that the State violated *Brady* when it allegedly failed to disclose that alibi witnesses had given exculpatory statements to the investigating detective before the defendant's trial, and when its agents threatened and harassed these witnesses to prevent them from testifying at trial.

¶ 81    Under *Brady*, the State has a constitutional obligation to disclose evidence that is both favorable to the accused and material either to guilt or to punishment. *People v. Burt*, 205 Ill. 2d 28, 46-47 (2001). Evidence is material if there is a reasonable probability that disclosure of the evidence would have altered the outcome of the proceeding. *People v. Anderson*, 375 Ill. App. 3d 990, 1011 (2007). A reasonable probability of a different result is one sufficient to undermine confidence in the outcome. *Id.* To establish a *Brady* violation, a defendant must show that (1) the undisclosed evidence is favorable to defendant because it is either exculpatory or impeaching, (2) the evidence was suppressed by the State either willfully or inadvertently, and (3) defendant was prejudiced because the evidence is material to guilt or punishment. *Burt*, 205 Ill. 2d at 47.

¶ 82    Initially, in its appellee brief filed before remand, the State contended that the defendant failed to demonstrate cause and prejudice. In making this argument, the State argued that the defendant "would have this Court believe that this claim already passed the 'cause and prejudice' test when the [trial] court originally docketed his second successive postconviction petition for

27

further review." However, the State argued that the record demonstrated that the trial court docketed the claim as a freestanding claim of actual innocence. The State acknowledged that it did not seek dismissal at second-stage proceedings based on cause and prejudice but argued that it could not do so when the petition was docketed as one sounding in actual innocence. The State further argued that it is proper for us to review the defendant's successive amended postconviction petition for cause and prejudice because the defendant is arguing on appeal that the postconviction court erred in not analyzing his claim as a *Brady* violation.

¶ 83 As support for its contention that the postconviction court docketed the defendant's claim as an actual innocence claim, the State pointed to the court's September 16, 2010, order that docketed the defendant's successive petition for further proceedings. In that order, the court stated, "[defendant] makes a claim of actual innocence," and appointed him counsel. Moreover, in further support, there is nothing in the record to demonstrate that the court engaged in any cause and prejudice analysis regarding the *Brady* claim.

¶ 84 In response, the defendant contended that the State forfeited any argument concerning cause and prejudice because it failed to seek dismissal on that basis in the postconviction proceedings. The defendant argued that, regardless of the postconviction court's construction of the claim, the State had ample notice that the defendant was raising a *Brady* claim as the defendant's initial *pro se* petition, and some of his subsequent *pro se* supplemental filings, explicitly invoked and discussed *Brady*. Further, appointed counsel's amended petition separately argued that the State suppressed exculpatory evidence in violation of *Brady*, and the State responded to that amended petition without arguing dismissal based on cause and prejudice.

¶ 85 After reconsidering the record upon remand, we agree with the defendant that the State has forfeited this argument because it had the opportunity to seek dismissal, at the second-stage

28

postconviction proceedings, of the separately alleged *Brady* claim on cause and prejudice grounds, and it failed to do so. See *Ayala*, 2012 IL App (1st) 192484, ¶ 104. Thus, we will not address the State's cause and prejudice argument.

¶ 86    As for the *Brady* claim, the State, in its appellee brief, only contested the presence of the third requirement for establishing a *Brady* violation, *i.e.*, the defendant was prejudiced because the evidence is material to guilt or punishment. Thus, we will only focus on this requirement. In his supplemental brief, the defendant contends that, if the evidence is conclusive for an actual innocence claim, then the same evidence is material for a *Brady* claim. Thus, the defendant contends that, since the previously-suppressed alibi evidence, which is taken as true, is conclusive for his actual innocence claim, it would also be material. However, the defendant also argues that, even if the alibi evidence does not satisfy the criteria for an actual innocence claim, the evidence is still material because it satisfies *Brady*'s lower prejudice standard. The defendant argues that, had the evidence been disclosed, it would have created at least a reasonable probability that the confidence in the outcome of the trial would be undermined since there was no physical evidence linking him to the shooting, and it would have corroborated his testimony that he was at home on the night of the shooting.

¶ 87    However, as we concluded in our previously filed decision that was vacated, we again conclude that the purported exculpatory evidence contained in the alibi witnesses' affidavits is not material. As explained above, we do not find that the evidence is conclusive for an actual innocence claim. Similarly, we find that the defendant cannot meet the materiality requirement for a *Brady* claim. See *People v. Green*, 2012 IL App (4th) 101034, ¶ 40 ("even if defendant's claim were new, defendant could not meet the *Brady* materiality test because, as we explained in rejecting defendant's claim of actual innocence, no reasonable probability exists that the result of his trial

29

would have been different"). Accordingly, we also affirm the trial court's dismissal of the defendant's *Brady* claim.

¶ 88                                    III. CONCLUSION

¶ 89    For the reasons stated, we affirm the circuit court's judgment dismissing the defendant's successive amended postconviction petition without an evidentiary hearing.


¶ 90    Affirmed.